A03A1612. CAVES v. COLUMBUS BANK & TRUST COMPANY.
(589 SE2d 670)

RUFFIN, Presiding Judge.

Columbus Bank & Trust Company ("CB&T") sued Dr. Sammy Caves and several other defendants, alleging claims for racketeering, breach of contract, breach of guaranty, and constructive trust. CB&T subsequently moved for partial summary judgment against Caves on its guaranty claim. The trial court granted the motion and ordered Caves to pay CB&T $5,756,728.90. Caves appeals, and for reasons that follow, we affirm in part and reverse in part.

To prevail on summary judgment, CB&T must show that no genuine issue of material fact remains and that it is entitled to judgment as a matter of law.[1] Once CB&T makes this prima facie showing, "the burden shift[s] to [Caves] to come forward with evidence establishing

---

[1] See *Heath v. Boston Capital Corporate Tax Credit Fund VIII*, 253 Ga. App. 537, 538 (1) (559 SE2d 743) (2002).

a defense" to the guaranty.[2] On appeal, we review the trial court's summary judgment ruling de novo, construing the evidence and all reasonable inferences in favor of Caves, the nonmovant.[3]

Viewed in this manner, the record shows that Caves was a director and shareholder of Preferred Alliance, Inc. ("PAI"), a company that sold discount medical and travel programs through telemarketers. Because PAI's business involved a high volume of credit card transactions, PAI needed a merchant relationship with a bank authorized to process the credit card charges. PAI established such a relationship with CB&T.

On March 22, 2001, PAI signed a merchant agreement with CB&T, under which CB&T agreed to process the transactions and credit PAI's account for the amount of each credit card charge. The agreement referenced a "merchant number," which corresponded to PAI's merchant account for sales of the Genesis Card, a medical discount program. Caves subsequently signed a "personal guaranty of merchant indebtedness" relating to this agreement. Pursuant to the guaranty, Caves "unconditionally guarantee[d] payment of all indebtedness of [PAI] to [CB&T] of every nature whatsoever at any time or times heretofore or henceforth incurred or arising under or within the contemplation of [the] Merchant Agreement."

In late April 2001, CB&T prepared paperwork for an additional merchant account associated with PAI's Cash-Back-Cruise ("CBC") program, which provided cruise discounts to customers.[4] Although CB&T drafted a merchant agreement for that account, PAI apparently never signed the agreement. Nevertheless, CB&T assigned the product a merchant number, and Caves signed a guaranty referencing the CBC account.

In July 2001, PAI introduced its Vacant Sun product, a travel discount program. CB&T opened a merchant account for that product and assigned it a merchant number. PAI, however, never executed a separate merchant agreement for the account, and Caves did not sign a guaranty specifically referencing Vacant Sun.

Beginning in May 2001, representatives from VISA credit card sent CB&T letters indicating that VISA had received numerous "chargebacks" on credit card sales of the Genesis Card. Such "chargebacks" — or reversed charges — result when a cardholder questions or disputes a credit card transaction. Credit card companies monitor the level of chargebacks associated with a merchant to

---

[2] Id.

[3] See *Reece v. Chestatee State Bank*, 260 Ga. App. 136 (579 SE2d 11) (2003).

[4] At the same time, CB&T prepared a merchant application for another product – the AdvantagePlus card – but that account is not at issue in this appeal.

detect possible fraud. Merchants that continually exceed a threshold ratio of chargebacks are subject to fines by the credit card company.

Although VISA informed CB&T in May and June that PAI's chargebacks exceeded the permissible ratio, CB&T did not provide this information to PAI until August 2001. At that point, representatives from CB&T, PAI, and VISA discussed the situation, and VISA decided to waive fines that had accrued over the prior months. After the discussion, PAI changed its sales techniques in several ways to reduce the customer disputes. The company also delayed plans to expand its sales efforts until it could reduce the chargebacks.

In October 2001, PAI's president, Bruno Faillace, called his principal contact at CB&T, Stephen Raines, to inquire about the chargeback ratio. Raines requested the current data from VISA and learned that the ratio for the Genesis Card was within acceptable levels. Raines reported the ratio to Faillace, who was "ecstatic" about PAI's "successful reduction of chargebacks." Relying on this information, PAI doubled its volume of business and increased its revenues by 50 percent.

At the end of November, however, VISA informed CB&T that it had miscalculated the ratio in October and that PAI's chargebacks exceeded permissible levels. Concerned about tarnishing its relationship with VISA by allowing a merchant to operate outside VISA's chargeback guidelines, CB&T closed PAI's merchant accounts in January 2002. PAI ceased operations a short time later, but substantial chargebacks continued to accrue for products already sold.

On March 4, 2002, CB&T sued Caves for, among other things, breach of guaranty. CB&T later moved for summary judgment on this claim. To support the motion, it submitted the affidavit of Wade Burford, its senior vice president, who testified that CB&T had incurred $5,746,906.60 in fines, penalties, and chargebacks involving the PAI accounts. CB&T's executive vice president, John Dodds, provided updated figures at his deposition two months later, testifying as follows:

> I've got up-to-date, as of August 30th, numbers from our CFO this morning. . . . The total breakdown is, in total losses, $5,756,728.90. And the breakdown is such that Genesiscard was $2,705,029.15; VacantSun, $2,559,693.68; CBC Renewal was $12,006.10; and a Mastercard fine of $480,000.[5]

---

[5] We note that the total reported by Dodds differs from the sum of the broken-down figures by three cents. Caves does not contend that this three-cent discrepancy creates a question of fact.

Granting CB&T summary judgment on the guaranty claim, the trial court found Caves personally liable for the entire, updated indebtedness outlined by Dodds. Caves appeals, arguing that the trial court erred because (1) CB&T failed to establish a prima facie case of liability; (2) the record contains no evidence that he personally guaranteed the Vacant Sun account; (3) he is entitled to a discharge of guaranty obligations under OCGA §§ 10-7-21 and 10-7-22; and (4) the doctrine of estoppel bars CB&T from enforcing the guaranties. As discussed below, the trial court properly granted CB&T summary judgment as to the Genesis Card account. Questions of fact remain, however, regarding Caves' liability for the Vacant Sun and CBC indebtedness, as well as the $480,000 MasterCard fine.

1. Before turning to the merits of this appeal, we must address an issue raised by Caves at oral argument. During argument, Caves asserted that, since CB&T moved for summary judgment on the *entire* indebtedness, we cannot affirm the trial court's ruling as to part of the debt and reverse as to the other part. According to Caves, if material issues of fact remain regarding his liability on any portion of the obligation, we must completely reverse the trial court's decision.

As our Supreme Court recently noted, "[t]he purpose behind summary judgment is to 'dispose of litigation expeditiously and avoid useless time and expense to go through a jury trial.'"[6] This case involves Caves' alleged liability for losses incurred by CB&T relating to three different merchant accounts. Although CB&T sought judgment as a matter of law as to the entire debt, we are not barred from finding summary judgment appropriate as to part, but not all, of the liability. To conclude otherwise would undermine the purposes of summary judgment and hinder judicial economy.[7]

2. *The Genesis Card account.* Caves argues that CB&T failed to establish a prima facie case as to his liability on the Genesis Card account. We disagree.

(a) The record shows that PAI signed a merchant agreement relating to that account on March 22, 2001. Pursuant to the agreement, PAI agreed to repay CB&T for amounts initially credited to PAI, but later disputed by credit card holders. PAI also agreed to indemnify CB&T and hold it harmless for any losses resulting from such disputes. Furthermore, Caves signed a personal guaranty in conjunction with the March 22, 2001 agreement, through which he unconditionally guaranteed payment of all indebtedness arising under the agreement.

---

[6] *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828 (2) (573 SE2d 389) (2002).
[7] See *City of Gainesville v. Dodd*, 275 Ga. 834, 837 (573 SE2d 369) (2002) (appellate court's de novo review of the record on summary judgment advances judicial economy).

Caves does not dispute that PAI executed the Genesis Card merchant agreement or that he signed a corresponding personal guaranty. Instead, he vaguely claims that CB&T presented no evidence that PAI's obligation under the agreement "had matured." As mentioned above, however, the merchant agreement required PAI to reimburse CB&T for any losses resulting from customer disputes or chargebacks. And CB&T presented evidence, through Dodds, that it sustained $2,705,029.15 in chargebacks and related penalties on the Genesis Card account. CB&T thus made a prima facie showing that a Genesis Card indebtedness covered by Caves' personal guaranty was due and owing.[8]

We note that, at the summary judgment hearing, Caves asserted that Dodds' testimony regarding the amount owed on the individual accounts lacked foundation "as to where [the figures] came from."[9] Dodds testified, however, that he obtained the information from the bank's chief financial officer. Furthermore, "[w]e have held that objection on the ground of a lack of proper foundation without stating what the proper foundation should be is insufficient and presents nothing for consideration on appeal."[10] Caves did not specify the foundational element he contends is lacking, and the trial court clearly rejected his argument, relying on Dodds' testimony regarding the updated figures in granting summary judgment.[11] Under these circumstances, we need not disregard Dodds' testimony.

(b) Once CB&T made its prima facie showing, the burden shifted to Caves to establish a defense to the guaranty.[12] Caves raises several potential defenses to liability.

(i) Citing OCGA §§ 10-7-21 and 10-7-22, Caves claims that he has been discharged from his obligations. Neither provision supports a discharge.

Under OCGA § 10-7-21, "[a]ny change in the nature or terms of a contract is called a 'novation'; such novation, without the consent of

---

[8] See *Vickers v. Chrysler Credit Corp.*, 158 Ga. App. 434, 440-441 (4) (280 SE2d 842) (1981) (credit company made prima facie showing that it was entitled to judgment under guaranty by establishing existence of guaranty and amount owed on underlying debt).

[9] Citing *Benton Bros. Ford Co. v. Cotton States Mut. Ins. Co.*, 157 Ga. App. 448, 449 (1) (278 SE2d 40) (1981), Caves also asserted at oral argument before this Court that Dodds' testimony cannot be considered on summary judgment because CB&T did not file it with the trial court until the day before the summary judgment hearing. Caves, however, has pointed to no evidence that he raised this argument below, and we have found no such objection. Accordingly, he has waived the objection. See *Smith v. Steinemann Dev. Co.*, 230 Ga. App. 635, 636 (1) (497 SE2d 255) (1998) ("[A]n objection to the timeliness of an affidavit submitted in support of a motion for summary judgment will be deemed waived unless it is itself timely raised in the trial court.").

[10] (Punctuation omitted.) *Nelson v. State*, 255 Ga. App. 315, 319 (2) (565 SE2d 551) (2002).

[11] See id.; see also *Tolver v. State*, 269 Ga. 530, 531-532 (2) (500 SE2d 563) (1998).

[12] See *Heath*, supra; *Vickers*, supra.

the surety, discharges him." Other than generally citing this provision, Caves has made no effort to identify the novation, establish when it occurred, or demonstrate how the merchant agreement or any other contract at issue was altered. In short, he has presented no argument relating to novation and, thus, has abandoned this claim.[13]

Caves instead focuses on OCGA § 10-7-22, which states: "Any act of the creditor, either before or after judgment against the principal, which injures the surety or increases his risk or exposes him to greater liability shall discharge him." He asserts that CB&T increased his risk under the guaranty by "deliberately fail[ing] to disclose to [him] its own prohibition against telemarketing activity." According to Caves, had he "known that CB&T was reluctant to allow telemarketing activities by its merchants, he would not have signed any guaranty agreement." This argument centers around PAI's merchant agreement, which provides that "[m]erchant shall not engage in soliciting or accepting mail orders, telephone orders, recurring transactions, multiple sales drafts, or partially completed drafts without prior written authorization from the bank."

As an initial matter, Caves' apparent claim that CB&T concealed its policy regarding telemarketing activities lacks any factual basis. CB&T clearly stated its policy in the merchant agreement, which is specifically referenced in the guaranty signed by Caves. In fact, Caves' liability under the guaranty is tied directly to the merchant agreement. Caves testified that he did not see the March 22, 2001 merchant agreement when he signed the guaranty and did not realize such an agreement even existed. His failure to read the guaranty carefully and inform himself about his obligations, however, cannot discharge him from liability.[14]

Furthermore, the evidence shows that CB&T did *not* have a policy prohibiting telemarketing activities by its merchants. Raines, PAI's contact at the bank, testified that he was well aware of PAI's reliance on telemarketing when he began working with the accounts. And, when PAI entered the merchant agreement in March 2001, CB&T had approximately 1,600 merchant accounts involving some form of telemarketing.

Finally, to the extent Caves bases this defense on a claim that

---

[13] See Court of Appeals Rule 27 (c) (2).

[14] See OCGA § 23-2-29 ("If a party, by reasonable diligence, could have had knowledge of the truth, equity shall not grant relief; nor shall the ignorance of a fact known to the opposite party justify an interference if there has been no misplaced confidence, misrepresentation, or other fraudulent act."); *Fore v. Parnell-Martin Cos.*, 192 Ga. App. 851, 852 (1) (386 SE2d 723) (1989) ("It is the duty of contracting parties to inform themselves with reference to the subject matter about which they desire to contract; if they fail to do so and a mistake is made owing to their own ignorance and failure to inform themselves, then any injury results from their own conduct.") (punctuation omitted).

CB&T negligently handled PAI's accounts or falsely reported PAI's chargeback ratio, he has waived that claim. By its terms, Caves' guaranty

> constitute[s] a primary, absolute, independent and continuing obligation of the [guarantor] and shall not be affected or impaired by . . . any offsetting claim or defense merchant may purport to have against Bank under the Merchant Agreement or otherwise.

In *Bobbitt v. Firestone Tire &c. Co.*,[15] we construed a similar provision. Citing the predecessor to OCGA § 10-7-22, the *Bobbitt* sureties asserted that Firestone increased their risk and discharged their obligations by supplying defective merchandise to the principal debtor. We rejected this argument because the sureties had agreed in the surety contract that "no claim by the [principal debtor] against [Firestone] would reduce their liability to [Firestone]."[16] As we further noted, " '[a] surety or guarantor may consent in advance to a course of conduct which would otherwise result in his discharge.' "[17] Thus, despite the alleged increased risk, the trial court properly entered summary judgment against the sureties.[18]

Like the *Bobbitt* sureties, Caves waived his right to seek a discharge based on a claim or defense that PAI might have against the bank. And any argument that CB&T mishandled PAI's accounts or falsely reported information regarding the accounts constitutes such a claim or defense. Caves, therefore, cannot avoid liability by asserting that this alleged conduct increased his risk under the guaranty.[19]

(ii) Caves also argues that, because the bank mishandled the accounts and erroneously reported the chargeback information, CB&T should be estopped from enforcing the guaranty. But, as discussed above, Caves waived such defense in the guaranty agreement.

Caves failed to establish a defense to CB&T's guaranty claim as to the Genesis Card account. Accordingly, the trial court properly granted CB&T summary judgment on the $2,705,029.15 indebtedness associated with that account.

3. We agree with Caves that CB&T is not entitled to judgment as a matter of law on the remaining indebtedness.

---

[15] 158 Ga. App. 580, 581-582 (2) (281 SE2d 324) (1981).

[16] Id. at 581.

[17] Id. at 581-582; see also *Panasonic Indus. Co. v. Hall*, 197 Ga. App. 860, 861 (1) (399 SE2d 733) (1990).

[18] See *Bobbitt*, supra at 581-582.

[19] See id.; see also *Heath*, supra at 539 (2) (guarantor cannot avoid liability based on defense that it waived in guaranty agreement).

(a) *The CBC account.* The record shows that Caves signed a guaranty specifically referencing the CBC program. That guaranty, however, links Caves' liability to indebtedness arising under a merchant agreement. And genuine issues of fact remain as to whether PAI signed such an agreement for the CBC account.

Without dispute, the record contains no signed merchant agreement explicitly covering the CBC account. Nevertheless, Raines recalled at his deposition that PAI signed a CBC merchant agreement. Raines later changed that testimony through an errata sheet, asserting that "all of the PAI account numbers were set up under the original PAI merchant agreement." Based on this errata sheet, CB&T argues that the March 22, 2001 merchant agreement covered all PAI accounts as a matter of law.

We disagree. Even if Raines' contradictory testimony does not, itself, create a question of fact, factual issues remain regarding the existence of a merchant agreement for the CBC account. According to Raines, merchant agreements that apply to more than one account contain "an addendum . . . stating the account numbers." The only account number listed on the March 22, 2001 agreement corresponds to the Genesis Card account. Although the CBC program, as well as the Vacant Sun program, received account numbers, those identifiers do not appear anywhere on the March 22, 2001 agreement, and the record reveals no addendum. Finally, the record shows that CB&T prepared a merchant agreement specifically for the CBC account, but never had that agreement signed.

Under these circumstances, material issues of fact remain as to whether PAI ever entered a merchant agreement for the CBC account. And, since Caves' CBC guaranty only covers indebtedness arising under such an agreement, the trial court erred in granting CB&T summary judgment on the CBC indebtedness.

(b) *The Vacant Sun account.* Similarly, the trial court erred in granting CB&T summary judgment on its claim relating to the Vacant Sun program. The record does not contain a merchant agreement or guaranty referencing this account, and Caves does not recall signing a Vacant Sun guaranty.

CB&T argues that Caves signed a guaranty applicable to the March 22, 2001 merchant agreement, which, in turn, covered the Vacant Sun account. As discussed above, however, questions of fact remain as to whether that agreement involved anything other than the Genesis Card account. Furthermore, Caves signed separate guaranties for the CBC program and the AdvantagePlus card, a fourth product sold by PAI, undermining the bank's claim that the guaranty relating to the March 22, 2001 agreement necessarily extended to all PAI accounts.

Georgia courts strictly construe guaranty agreements in favor of

the guarantor.[20] And the guarantor's liability cannot be extended by implication or interpretation.[21] Because CB&T failed to establish, as a matter of law, the existence of both a merchant agreement and a guaranty covering the Vacant Sun account, the trial court erred in granting CB&T summary judgment on this indebtedness.

(c) *The MasterCard fine.* The trial court also erred in finding Caves liable, as a matter of law, for the $480,000 MasterCard fine. The record shows that this fine resulted from chargebacks accrued by PAI. CB&T, however, made no effort to tie the fine to chargebacks on any particular account. Thus, we do not know whether the fine relates to Genesis Card chargebacks, Vacant Sun chargebacks, CBC chargebacks, or a combination of the three. Given the factual disputes regarding Caves' liability on the Vacant Sun and CBC accounts, issues of fact remain as to his obligation to pay part or all of this fine.

*Judgment affirmed in part and reversed in part. Smith, C. J., and Miller, J., concur.*

DECIDED NOVEMBER 13, 2003.

*Morgan & Mullin, Clarence M. Mullin, Raley & Sandifer, G. Brian Raley,* for appellant.

*Womble, Carlyle, Sandridge & Rice, Nisbet S. Kendrick III, John A. Thomson, Jr., Kelly A. Lee, Buchanan & Land, Jerry A. Buchanan,* for appellee.

---

[20] See *Rohm & Haas Co. v. Gainesville Paint &c. Co.*, 225 Ga. App. 441, 444 (2) (b) (483 SE2d 888) (1997); *Arnold v. Indcon, L.P.*, 219 Ga. App. 813 (1) (466 SE2d 684) (1996); OCGA § 10-7-3.

[21] See OCGA § 10-7-3; *Arnold*, supra.