## A04A1382. FAILLACE et al. v. COLUMBUS BANK & TRUST COMPANY.

(605 SE2d 450)

MILLER, Judge.

This is the second appearance before us of this case involving a massive telemarketing scheme. In *Caves v. Columbus Bank & Trust Co.*, 264 Ga. App. 107 (589 SE2d 670) (2003), we affirmed a grant of summary judgment to Columbus Bank & Trust Company (CB&T) on a portion of its guaranty claim against Sammy Caves, a director of the telemarketing entity Preferred Alliance, Inc. (PAI). Id. at 112-113 (2) (b). After Caves's bankruptcy removed him from the case, CB&T moved for summary judgment against his co-guarantors Bruno Faillace and E. Murray Newlin, who also moved for summary judgment against CB&T on the latter's Racketeer Influenced and Corrupt Organizations Act (RICO) claims against them. The trial court ruled in CB&T's favor on both motions. Having found no error, we affirm.

We rely on our opinion in *Caves* for a summary of the facts in the present case, including only what is relevant to this appeal. Caves, Faillace, and Newlin obtained a line of credit from CB&T for the purpose of funding their activities on behalf of PAI, a telemarketing entity selling discount medical and travel programs. All three men guaranteed the new line of credit by signing a "Personal Guaranty of Merchant Indebtedness." PAI obtained customers' consent to purchase the discount programs by a number of means, including the employment of agents already in possession of credit card data files, so that no additional information was needed in order to charge customers; the use of a set of practices known as "negative notice," under which a credit card would be charged unless the customer took some affirmative action after receiving a telephone call or a letter; and the making of multiple or other unauthorized charges. When customers complained that they had not consented to the charges, as they did by the thousands, PAI would always return their money (in what was known as a "chargeback") with funds taken from the same CB&T line that had credited the initial charge to PAI.

In *Caves*, we affirmed a portion of the trial court's grant of summary judgment to CB&T concerning the so-called GenesisCard account, one of a number maintained by CB&T for PAI's use. *Caves*, supra, 264 Ga. App. at 113 (2). Soon after the *Caves* appeal was decided, CB&T moved for summary judgment against Faillace and Newlin as to the same losses we granted to CB&T against Caves. For their part, and now joined by Faillace's wife, the defendants moved for summary judgment on CB&T's RICO claims. The trial court ruled in CB&T's favor on both motions, and the defendants appeal both rulings.

1. On appeal of a grant of summary judgment, we review the evidence de novo, considering it in the light most favorable to the nonmovants, to determine whether the trial court erred in concluding that no genuine issue of material fact remains and that CB&T was entitled to judgment as a matter of law. *Rubin v. Cello Corp.*, 235 Ga. App. 250 (510 SE2d 541) (1998).

Faillace and Newlin argue that CB&T is not entitled to summary judgment on its claims arising from the GenesisCard account because questions of fact remain concerning their assertions that CB&T defrauded them into signing the guarantee agreement and deceived them as to its ability to handle PAI's business. As we held in *Caves*, neither of these contentions has merit. *Caves*, supra, 264 Ga. App. at 112-113 (2).

Caves, Faillace, and Newlin all signed the same "Personal Guaranty of Merchant Indebtedness," agreeing thereby to "unconditionally guarantee payment of all indebtedness" arising from PAI's Merchant Agreement with CB&T. Like Caves, both Faillace and Newlin were named defendants in CB&T's original complaint. Whatever their role in PAI's day-to-day operations, and however they now seek to construe the guarantee agreement they signed, Faillace and Newlin assumed responsibility for PAI's indebtedness in the same unambiguous language as Caves, "waiv[ing] [their] right to seek a discharge based on a claim or defense that PAI might have against the bank." *Caves*, supra, 264 Ga. App. at 113 (2) (b) (i); *Bobbitt v. Firestone Tire & Rubber Co.*, 158 Ga. App. 580, 581-582 (2) (281 SE2d 324) (1981); *Village Enterprises v. Ga. R. Bank & Trust Co.*, 117 Ga. App. 773, 776 (3) (161 SE2d 901) (1968) (rejecting evidence on intention and knowledge of parties when contract language was unambiguous). Thus we affirm the trial court's grant of summary judgment to CB&T concerning the GenesisCard account.

2. Defendants also contend that the trial court erred in denying their motion for summary judgment on CB&T's RICO claims, for two reasons: (a) because no genuine issue of material fact remained on those claims, and (b) because the bank did not have standing to assert them. We disagree.

(a) The Georgia RICO Act dates from 1980, ten years after the federal statute on which it is modeled. OCGA § 16-14-1 et seq. Its prohibitions read:

> (a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

(b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

(c) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

OCGA § 16-14-4; Ga. L. 1980, p. 405, § 1. The Act defines a "pattern of racketeering activity" as

[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are *interrelated by distinguishing characteristics. . . .*

(Emphasis supplied.) OCGA § 16-14-3 (8) (A). The Act defines "racketeering activity" itself as the perpetration of one or more of the crimes set forth in OCGA § 16-14-3 (9) (A), including theft by deception. OCGA §§ 16-14-3 (9) (A) (ix); 16-8-3; see *Saxon v. State*, 266 Ga. App. 547, 551 (1) (597 SE2d 608) (2004).

(i) The Act's first prohibition is against a person who acquires some property interest "through a pattern of racketeering activity or proceeds derived therefrom." OCGA § 16-14-4 (a). Defendants' summary judgment motion will be denied if a question of material fact remains as to whether any combination of the defendants' acts amounted to such a pattern. *Larson v. Smith*, 194 Ga. App. 698, 699-700 (391 SE2d 686) (1990). Defendants do not deny that each of them had an interest in PAI and obtained money from its telemarketing activities. They contend only that each of them must have engaged in at least two incidents of racketeering activity in order to be liable under OCGA § 16-14-4 (a). This is not the law.

Though it is true that a "pattern" for purposes of the Georgia RICO Act must consist of "at least two incidents of racketeering activity," *Rohm & Haas Co. v. Gainesville Paint & Supply Co.*, 225 Ga. App. 441, 446 (5) (b) (483 SE2d 888) (1997), this does not mean that *each* RICO defendant must commit at least two acts to come under the Act's prohibitions. If defendants' argument were to prevail, a racketeer could escape liability by limiting his participation in the racketeering enterprise to a single act, even one as decisive as forging a signature or pulling a trigger. Since the core purpose of the Act is to reach collective action, what matters is the existence of a pattern of criminal activity (including at least two interrelated acts) and each defendant's participation in that pattern, whether by one act or more.

See *Larson,* supra, 194 Ga. App. at 699-700; see also *H. J., Inc. v. Northwestern Bell Tel. Co.,* 492 U. S. 229, 239 (109 SC 2893, 106 LE2d 195) (1989) (that predicate acts are "related" and "either constitute or threaten long-term criminal activity" suffices to prove pattern).

The record before us includes voluminous evidence concerning all three RICO defendants' participation in and benefits obtained from PAI's activities, including Faillace's 32 percent initial stake and his direct supervision of the company's activities as its president; Newlin's 45 percent initial stake and his fundraising activities on its behalf; and Mrs. Faillace's responsibilities for responding to complaints from irate consumers, state attorneys general, and others. Thus CB&T has shown that a genuine issue of fact remains as to the defendants' participation in a pattern of racketeering activity sufficient to ground liability under OCGA § 16-14-4 (a).

(ii) In a retread of their argument above, the defendants contend that in order to make out a claim under the Georgia RICO Act's second prohibition against "conduct or participation" in an enterprise taking the form of racketeering activity, CB&T must show that each of them conducted the PAI enterprise through their own individual patterns of racketeering acts. Again, we disagree.

It is worth noting at the outset that an "enterprise" itself need not be illicit in order for RICO liability to attach to the racketeering conduct of an individual employee or associate, and that the existence of both an "enterprise" and "racketeering activity" within that enterprise can be proved by circumstantial evidence. See *Chancey v. State,* 256 Ga. 415, 420-423 (III) (349 SE2d 717) (1986); *United States v. Elliott,* 571 F2d 880, 898 (5th Cir. 1978). More important, although some participation in the racketeering activity is clearly required, there is nothing in OCGA § 16-14-4 (b) to suggest that each participant must hold a directorial or managerial position concerning that activity before criminal liability attaches. In this respect, the Georgia statute is significantly broader than the federal statute on which it was modeled. *Chancey,* supra, 256 Ga. at 418 (I); compare *Reves v. Ernst & Young,* 507 U. S. 170, 179 (113 SC 1163, 122 LE2d 525) (1993) (federal RICO liability "not limited to those with primary responsibility for the enterprise's affairs, ... but *some* part in directing [those] affairs is required") (emphasis in original).

As we have already suggested, the record contains substantial evidence that all three defendants were involved in PAI's operations, either as officers and directors (in the cases of Faillace and Newlin) or as operatives with substantial responsibility (in the case of Mrs. Faillace). Thus a jury could reasonably find that all three defendants were "knowing and voluntary participants in a racketeering enterprise" sufficient to establish liability under OCGA § 16-14-4 (b). See *Chancey,* supra, 256 Ga. at 427 (III) (4).

(iii) Defendants also contend that each of them must have committed at least two predicate acts in order to have the requisite intent for RICO conspiracy. The U. S. Supreme Court has held to the contrary, however:

> The interplay between [federal RICO enterprise liability] and [federal RICO conspiracy liability] does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.

*Salinas v. United States*, 522 U. S. 52, 65 (118 SC 469, 139 LE2d 352) (1997). The anti-conspiracy subsection of the Georgia RICO Act takes an even more expansive position than its federal counterpart, outlawing not only conspiracy itself but also attempted conspiracy as well. OCGA § 16-14-4 (c) (no person shall "conspire *or endeavor to violate*" subsections (a) or (b)) (emphasis supplied). Here, the same evidence creating a question of fact as to whether defendants participated in a RICO enterprise likewise creates a question of fact as to whether they conspired to do so with the requisite intent. See OCGA § 16-2-6 (intent as question of fact to be found from circumstances); *Patterson v. Proctor*, 237 Ga. App. 244, 246-247 (2) (514 SE2d 37) (1999) (defendant's intent to violate the Georgia RICO Act a question of fact for the jury).

(b) Finally, defendants contend that CB&T has no standing to recover for alleged frauds committed on credit card customers because those frauds were not the direct cause of its losses under the guarantee agreement, and because CB&T was not the target of the defendants' racketeering activity. Again, we disagree.

The Merchant Agreement signed by Faillace and Newlin included a provision that

> Merchant shall not present for deposit any sales draft or other item (whether manually or by electronic means) that Merchant knows or should know to be fraudulent or unauthorized by the cardholder.

CB&T alleges that having agreed to this and the other provisions of the guarantee agreement, the defendants fraudulently obtained charges from thousands of credit card customers and presented them to CB&T for payment into PAI's accounts. CB&T also alleges that Faillace and Newlin committed fraud when they failed to disclose that many of those customers as well as a number of state attorneys general were contesting the charges, and when they assured CB&T

that the rising tide of complaints and chargebacks was the result of mere technical and operational problems.

From the evidence in the record, a jury could reasonably find that defendants' scheme was to obtain fraudulent charges from customers; to defraud CB&T into approving these charges in the first instance; to forestall the collapse of the scheme by never contesting chargebacks and by concealing their volume for as long as possible; and to use the time thus gained to transform PAI grosses into personal assets.[1] In the short term, rivers of money would flow through PAI's accounts. In the long term, the entire operation would go bust, with CB&T left holding the bag until such time — still not arrived — as it could recover from the co-guarantors Caves, Faillace, and Newlin.

The record contains ample evidence from which a jury could determine that CB&T, no less than the credit card customers, was a principal and direct target of this scheme, which in fact cost CB&T over $5 million as to all PAI's activities and well over $2 million as to the single GenesisCard account at issue in Division 1. Thus CB&T has standing to assert that defendants conspired to engage in activity prohibited by the Georgia RICO Act. See *Beck v. Prupis*, 529 U. S. 494, 505-506 (120 SC 1608, 146 LE2d 561) (2000) (person injured by tortious act in furtherance of conspiracy may assert federal RICO conspiracy claim).

The trial court's grant of CB&T's motion for summary judgment on its claims arising from the GenesisCard account and its denial of the defendants' motion for summary judgment on CB&T's RICO claims are affirmed.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED OCTOBER 4, 2004.

*Raley & Sandifer, G. Brian Raley, Catherine F. Munson, Morgan & Mullin, Clarence M. Mullin*, for appellants.

*Womble, Carlyle, Sandridge & Rice, Nisbet S. Kendrick III, John A. Thomson, Jr., Kelly A. Lee, Buchanan & Land, Jerry A. Buchanan, Denney, Pease, Allison & Kirk, John W. Denney, Thurbert E. Baker, Attorney General, Jones & Walden, Leon S. Jones, Macey, Wilensky,*

---

[1] As the trial court stated at oral argument: "[T]he way it works is if you've got complaining parties who ask for the money to be refunded, you refund it and then there are a number of people who supposedly have these charges on their accounts who don't complain and the money comes in. I see Mr. Newlin nodding and I see [counsel for CB&T] nodding. So I think I understand. . . ."

*Cohen, Wittner & Kessler, Frank B. Wilensky, Louis G. McBryan,* for appellee.

