**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 23, 2022**

# In the Court of Appeals of Georgia

A22A0911. BENEVOLENT LODGE NO. 3 v. FRANK J. DAVIS AS EXECUTOR OF THE ESTATE OF RANDALL L. HATTAWAY.

DILLARD, Presiding Judge.

Following a grant of summary judgment in favor of Frank J. Davis, as executor of the Estate of Randall L. Hattaway, Benevolent Lodge No. 3 appeals.[1] In doing so, the Lodge claims the trial court erred because (1) contrary to the court's conclusion, the statute of limitation has not run; (2) there was evidence of a conspiracy between Hattaway and the Lodge's treasurer; and (3) officers of the Lodge exercised due diligence in attempting to discover its treasurer's theft of funds. For the reasons set forth *infra*, we affirm.

---

[1] For ease of reference, we will refer to the Estate of Randall L. Hattaway as "the Estate" or "Hattaway" and Benevolent Lodge No. 3 as "the Lodge" throughout this opinion.

Viewed in the light most favorable to the Lodge (*i.e.*, the nonmovant),[2] the record shows it is a 501 (c) (3) Masonic fraternal organization. And in addition to having various membership positions, including officers (the most senior of which is referred to as the "Worshipful Master"), the Lodge has a separate board of trustees which owns its building but no other assets. Members of the board of trustees are all past Worshipful Masters with an understanding of how the Lodge operates. At one point, Hattaway was a trustee and served as the board's chairman, but by the time of the events in question, he no longer regularly attended Lodge meetings. Hattaway also operated an accounting firm and completed tax returns for the Lodge.

As for the annually elected positions, officers received no official training upon assuming their positions, nor were there any policies, procedures, or handbooks given to them. Instead, as members progressed through positions, they learned their duties by observing others while attending meetings or through "on the job" training. Nevertheless, there were bylaws and rules kept at the Lodge building and made

---

[2] *See, e.g.*, *Patterson v. Kevon, LLC*, 304 Ga. 232, 236 (818 SE2d 575) (2018) ("We review a grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmovants and drawing every reasonable inference in their favor.").

available for members to read. And upon election, a new Worshipful Master accompanied the acting treasurer to the bank to review the Lodge's investments and holdings.

During the relevant years, Dwight Riddle served as the elected treasurer of the Lodge; and in that capacity, he periodically provided financial reports to the group as a whole—including an annual report—through oral presentations. Riddle had a reputation within the Lodge as a penny pincher, which contributed to the unequivocal trust others placed in his abilities as treasurer. As a result, neither the Worshipful Masters nor the other officers were apparently troubled by Riddle's practice of not providing them with copies of the Lodge's tax returns for their review. Instead, they all "just assumed that everything was right." Additionally, bank statements for the Lodge were sent directly to Riddle's home and were not reviewed by the Worshipful Masters or other officers. Indeed, because Riddle was so trusted, no procedures were in place to double check his work. But eventually, someone began to ask questions about the Lodge's finances.

Kelly Montgomery—who was working in law enforcement at the time—ascended through the leadership ranks of the Lodge to Worshipful Master. While doing so, he became dissatisfied with the information Riddle provided in his

financial "reports" to the Lodge because they never included written documentation or exact numbers. Instead, Riddle orally reported that the Lodge had "a little bit of money over here" and "a little bit of money over there," and he repeated the same information every year. This murky and vague practice of financial reporting deeply troubled Montgomery. And as a result of his growing concerns, in 2017, he requested that Riddle submit a written annual report; but Riddle continuously delayed its production. Montgomery then reached out to Hattaway and asked to see the Lodge's tax returns up to the point before Riddle's tenure as treasurer. Montgomery suspected the Lodge was missing money based upon the prior Worshipful Master's opinion that the finances "[didn't] quite look right."

Several months after this request, Hattaway called Montgomery to his office, and Montgomery brought along the person next in line to become Worshipful Master. According to Montgomery, at that meeting, Hattaway gave him a single piece of paper entitled Accounts Receivable, which listed a number of loans made by the Lodge to different member. Most notably, this document included an "astronomical number"—*i.e.*, "hundreds and hundreds and hundreds of thousands of dollars"—loaned to Riddle. And upon sliding this sheet across the table, Hattaway—who informed the duo that he was planning to retire from

4

accounting—said "I'm done," wiped his hands, and said "I can't do it anymore, I'm finished." Hattaway then handed Montgomery a stack of what Montgomery described as "IOUs" from Riddle to the Lodge, and Hattaway explained that every year when taxes came due, Riddle provided him with such documents and that it had "just gotten out of hand." Hattaway also later gave Montgomery copies of the Lodge's tax returns.

After learning of these financial improprieties, Montgomery called a meeting with the other Lodge officers. And during that meeting, the officers learned of the multi-year series of high-dollar "loans" purportedly made by the Lodge to Riddle, totaling more than $700,000. Although members were permitted to borrow money from the Lodge, it was not a common practice to do so; and the decision of whether to make a loan to a member had to be voted upon by the entire Lodge as a matter of protocol under the bylaws and memorialized in meeting minutes.[3] And importantly,

---

[3] Despite this testimony, it is undisputed that—in addition to learning about the significant amount of money borrowed by Riddle—members were also informed about much smaller amounts borrowed by other members (*i.e.*, amounts of less than $1000), which had likewise not previously been voted upon by the Lodge. Moreover, when testifying to this practice, Montgomery interpreted the Lodge's bylaws regarding charitable giving as applying to loans for members, though the bylaws—as read into the record during his deposition—did not specifically mention loans. Indeed, up until 2018, when Montgomery's successor as Worshipful Master asked the bylaws committee to update the document, the Lodge bylaws had not been revised since 1947.

no loans were ever approved by the Lodge to Riddle. So, upon making this discovery, the officers decided to involve law enforcement (the local sheriff was a member of the Lodge), and were told to take control of any Lodge financial materials in Riddle's possession. They did, and after providing the requested materials, Riddle walked out to his vehicle, retrieved a gun, and committed suicide in the parking lot. During the GBI investigation that followed, a previously unknown investment account was discovered, and it was from that account Riddle had taken the money for his "loans."[4] Thereafter, the Lodge entered into a settlement agreement with Riddle's estate.

On July 3, 2019, the Lodge filed suit against the then deceased Hattaway's estate, alleging Hattaway was negligent in failing to inform the Lodge of the apparent theft of funds by Riddle and that he fraudulently concealed the negligence. Additionally, the Lodge made a claim for 158 "separate violations" of the Georgia civil Racketeer Influenced and Corrupt Organizations Act[5] based upon allegations

---

[4] The Lodge's theory for how such an account existed without knowledge of other members was that Riddle told members that the organization lost all of the stock it owned in a particular bank when the bank went out of business; but instead, Riddle secretly converted some of those stocks into the funds used in the investment account.

[5] *See* OCGA § 16-14-6 (c) ("Any person who is injured by reason of any violation of Code Section 16-14-4 shall have a cause of action for three times the actual damages sustained and, where appropriate, punitive damages. Such person shall also recover attorney's fees in the trial and appellate courts and costs of

that Hattaway aided and abetted Riddle in 148 of the 158 instances of stealing Lodge funds. The Lodge later amended its complaint to remove the allegations of negligence and fraud but maintained its assertion that Hattaway aided and abetted Riddle in violating the civil RICO statute in 148 instances.

The Estate proceeded to file a motion for summary judgment, arguing that (1) the statute of limitation as to the civil RICO claims expired so as to bar the Lodge's action; (2) rather than over 100 separate violations of the RICO statute, one continuous act damaged the Lodge; (3) the Lodge could have discovered the harm through exercising due diligence; and (4) there was no showing Hattaway committed two predicate acts under the RICO statute.

Following a hearing on the motion, the trial court granted the Estate's motion for summary judgment, concluding there was no evidence to support the assertion that Hattaway entered into a conspiracy with Riddle from 2011 to 2017. Furthermore, the court concluded the Lodge's claims were barred by the five-year statute of limitation in OCGA § 16-14-18 and that a 2015 amendment to that statute did not restart the statute of limitation for the Lodge's action. This appeal by the Lodge follows.

investigation and litigation reasonably incurred. The defendant or any injured person may demand a trial by jury in any civil action brought pursuant to this Code section.").

7

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6] And a defendant may prevail on such a motion by showing the court that "the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case."[7] Importantly, a defendant "who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case."[8] Then, if the moving party discharges this burden, the nonmoving party "cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable

---

[6] OCGA § 9-11-56 (c); *accord Patterson*, 304 Ga. at 235.

[7] *Patterson*, 304 Ga. at 235 (punctuation omitted).

[8] *Id.* (punctuation omitted).

8

issue."[9] With these guiding principles in mind, we turn now to the Lodge's specific enumerations of error.

1. For starters, the Lodge contends the trial court erred in granting summary judgment in the Estate's favor when there were genuine issues of material fact as to whether Hattaway entered into a conspiracy with Riddle. More specifically, the Lodge argues that there remains a genuine issue of material fact as to whether Hattaway was "associated with or participated in Riddle's enterprise through a pattern of racketeering activity or whether he conspired with Riddle and committed an overt act to effect the object of the conspiracy" in violation of OCGA § 16-14-4 (b) or (c). We disagree.

To establish a valid civil RICO claim, a plaintiff must "show that the defendant violated or conspired to violate Georgia's RICO Act and that the RICO violation proximately caused injury to the plaintiff."[10] Under OCGA § 16-14-4 (b), it is

---

[9] *Id.* at 235-36 (punctuation omitted).

[10] *Five Star Athlete Mgmt., Inc. v. Davis*, 355 Ga. App. 774, 778 (2) (845 SE2d 754) (2020); *accord Najarian Cap., LLC v. Clark*, 357 Ga. App. 685, 693 (4) (849 SE2d 262) (2020); *Vernon v. Assurance Forensic Acct., LLC*, 333 Ga. App. 377, 392 (774 SE2d 197) (2015); *see Wylie v. Denton*, 323 Ga. App. 161, 165 (1) (746 SE2d 689) (2013) (physical precedent only) ("To assert a civil claim based upon either a violation of the RICO statute or a conspiracy to violate that statute, a plaintiff must show that the defendants violated or conspired to violate the RICO statute; that as a

9

"unlawful for any person employed by or associated with any enterprise[11] to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity[12]." Importantly, a plaintiff demonstrates racketeering activity

---

result of this conduct the plaintiff has suffered injury; and that the defendant's violation of or conspiracy to violate the RICO statute was the proximate cause of the injury.").

[11] "Enterprise" is defined to mean "any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities." OCGA § 16-14-3 (3); *accord Kimbrough v. State*, 300 Ga. 878, 878 n.3 (799 SE2d 229) (2017); *see Chancey v. State*, 256 Ga. 415, 417 (I) (349 SE2d 717) (1986) ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . . [It is] proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (punctuation omitted)).

[12] "Pattern of racketeering activity" is defined to mean, as relevant here, "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents . . ." OCGA § 16-14-3 (4) (A); *see Chancey v. State*, 256 Ga. at 417 (I) ("The pattern of racketeering activity is . . . a series of criminal acts as defined by the statute. . . [It is] proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise." (punctuation omitted)). And "racketeering activity" means, as relevant here, "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving . . . [t]heft . . ." OCGA § 16-14-3 (5) (A) (xii).

10

by "showing that the defendant committed predicate offenses at least twice."[13] And under OCGA § 16-14-4 (c), it is "unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section." Violations of section (c) occur when a person, "together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and any one or more of such persons commits any overt act to effect the object of the conspiracy"[14] or "endeavors to violate any of the provisions of subsection (a) or (b) of this Code section and commits any overt act to effect the object of the endeavor."[15] And because the RICO Act is designed to "reach collective action, what matters is the existence of a pattern of criminal activity (including at least two interrelated acts) and each defendant's participation in that pattern, whether by one act or more."[16]

---

[13] *Cobb Cnty. v. Jones Grp. P.L.C.*, 218 Ga. App. 149, 154 (7) (460 SE2d 516) (1995) (punctuation omitted); *accord Goodwyn v. Cap. One, N.A.*, 127 FSupp3d 1367, 1378 (VI) (M.D. Ga. 2015) (construing Georgia law); *see Life Ins. Co. of Am. v. Clark*, 273 Ga. 44, 48 (2) n.22 (535 SE2d 234) (2000) (explaining that RICO claims require a pattern racketeering, or two or more incidents).

[14] OCGA § 16-14-4 (c) (1).

[15] OCGA § 16-14-4 (c) (2).

[16] *Faillace v. Columbus Bank & Tr. Co.*, 269 Ga. App. 866, 868 (2) (a) (i) (605 SE2d 450) (2004); *see also Larson v. Smith*, 194 Ga. App. 698, 698 (391 SE2d 686) (1990).

In this case, although the Lodge has already settled with Riddle's estate and it is not a party to these proceedings, the Lodge alleged in its complaint that Riddle engaged in 158 civil RICO violations by committing theft by conversion, which is a specific intent crime.[17] Theft by conversion occurs when a person, "having lawfully obtained funds or other property of another . . . under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, . . . knowingly converts the funds or property to his own use in violation of the agreement or legal obligation."[18] And as to Hattaway, the Lodge claims he conspired with Riddle for the thefts committed in 148 of those civil RICO violations.[19]

---

[17] *See Goodwyn*, 127 FSupp3d at1378 (VI) (explaining, while interpreting Georgia law, that theft and theft by conversion are specific intent crimes that require a defendant "to commit a particular act toward a particular purpose").

[18] OCGA § 16-8-4 (a).

[19] Although the Lodge refers to these instances as 158 individual violations of the Georgia RICO Act, in actuality they would be 158 predicate acts—*i.e.*, 158 predicate acts for RICO would not result in a 158-count indictment. *See generally Carr v. State*, 350 Ga. App. 461, 465 (1) (829 SE2d 641) (2019) (discussing a case in which defendant was prosecuted for three counts of violating the Georgia RICO Act based upon thirty-six predicate acts, with twenty-five of those acts involving theft and the other eleven acts involving money laundering, all committed over a four-year period); *Saxon v. State*, 266 Ga. App. 547, 547, 550-52 (1) (597 SE2d 608) (2004) (involving a defendant prosecuted for one count of violating the Georgia RICO Act

The Lodge identifies what it deems circumstantial evidence of Hattaway's involvement in Riddle's scheme to steal money from it and proffers as an "overt act" a statement by Hattaway that he was glad he had Riddle "fill out those promissory notes," which the Lodge claims was part of an effort to make the thefts appear to be legitimate loans. But the Lodge also asserts that—by virtue of his own membership in the Lodge—Hattaway (1) should have known the Lodge did not approve of the high-dollar loans to Riddle, and that the approval procedures for such loans had not been followed; (2) identified the assets as loans rather than thefts on the income tax returns and Lodge financial statements, which "aid[ed] Riddle in securing the fruits of his crime"; (3) never delivered copies of the financial statements or tax returns to anyone other than Riddle; (4) stalled when Montgomery asked to see the financial records in 2017; and (5) signed the income tax returns with Riddle.[20]

As our Supreme Court has explained, circumstantial evidence is "evidence which does not constitute direct proof with regard to the issue of fact or the

---

in a 53-count indictment of which *multiple* counts were for the different crimes that qualified as the predicate acts for purposes of the single RICO violation count).

[20] In Montgomery's opinion, as a member of the Lodge, chairman of the board of trustees, and a Mason, Hattaway "should have known or did know that the Lodge would not loan out an amount of money . . . to [Riddle in] that sum."

13

hypothesis sought to be proven by the evidence; rather, circumstantial evidence constitutes proof of other facts consistent with the hypothesis claimed."[21] And in general, when passing upon a motion for summary judgment, a finding of fact "which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists."[22] But this rule is subject to a significant limitation: "In neither criminal nor civil cases is it required that the proved circumstances shall show consistency with the hypothesis claimed and inconsistency with all other reasonable theories to the point of logical demonstration."[23] Thus, a plaintiff's claim may survive summary judgment with circumstantial evidence *if* other theories are *less probable*.[24]

---

[21] *Patterson*, 304 Ga. at 236 (punctuation omitted); *accord S. Ry. Co. v. Ga. Kraft Co.*, 258 Ga. 232, 232 (367 SE2d 539) (1988); *Havenbrook Homes, LLC v. Infinity Real Est. Invs., Inc.*, 356 Ga. App. 477, 487 (2) (847 SE2d 840) (2020); *Callaway v. Quinn*, 347 Ga. App. 325, 327 (1) (819 SE2d 493) (2018).

[22] *Patterson*, 304 Ga. at 236 (punctuation omitted); *accord Havenbrook Homes*, 356 Ga. App. at 487 (2); *Callaway*, 347 Ga. App. at 327 (1).

[23] *Patterson*, 304 Ga. at 236 (punctuation omitted); *accord Callaway*, 347 Ga. App. at 327 (1).

[24] *Patterson*, 304 Ga. at 236; *Havenbrook Homes*, 356 Ga. App. at 487 (2); *Callaway*, 347 Ga. App. at 327 (1).

Here, our *de novo* review of the record reveals there is no evidence Hattaway ever received any of the money Riddle purportedly "borrowed" from the Lodge, and the GBI investigation that resulted from the Lodge's discoveries never resulted in any arrests. Additionally, no one knew whether Riddle—who was Hattaway's only contact at the Lodge—told Hattaway the loans were authorized. Instead, there was direct evidence the standard practice was for Riddle to provide Hattaway's office with a hand written summary of information necessary to file the annual tax returns. And it was a third individual within Hattaway's office (who provided her testimony via affidavit) who actually prepared the first tax return in 2011, showing loans to Riddle from the Lodge. In doing so, she informed Hattaway that documentation was necessary for those loans. Then, upon receiving copies of promissory notes, she included the loans on the tax return. And afterward, boxes were checked on the tax returns to indicate the loans were approved by the Board or committee and that there were written agreements for the loans. Later, after Riddle's actions were revealed, Hattaway remarked to a Lodge officer that he was glad he made Riddle fill out promissory notes and reported the loans on the tax forms for the Lodge because the GBI had "cleared" him.

There is *no* evidence, then, that Hattaway acted with specific intent to harm the Lodge and commit theft.[25] Indeed, in addition to a complete lack of evidence that Hattaway received any of the Lodge's funds,[26] there was also no evidence he concealed the alleged loans because they were recorded on the Lodge's income tax returns and supported by promissory notes that Riddle provided to Hattaway after

---

[25] *See Golden v. FNF Servicing, Inc.*, Case No. 1:13-CV-33 (WLS), 2015 WL 5302703, at *8 (II) (A) (M.D. Ga. Sept. 10, 2015) (explaining that there was "no evidence of the specific intent necessary to establish that [defendant] committed theft by deception or theft by conversion" under Georgia law when the evidence of record showed only that defendant "was acting at the behest of [a third party] and under the belief that the [particular] loans remained valid, though riddled with issues that would be resolved by [the third party]"); *Goodwyn*, 127 FSupp3d at 1379 (VI) (explaining that there was "no evidence that any of [d]efendants' employees maintained specific intent to harm [plaintiff]" and that "[a]t most, the record shows that [d]efendants' employees were wrong in their interpretation of bankruptcy law or careless in checking their records"); *see also Avery v. Chrysler Motors Corp.*, 214 Ga. App. 602, 604 (1) (448 SE2d 737) (1994) ("The court was also correct in concluding that a failure to show the level of intent needed for proving theft by deception would preclude a jury issue on that crime as a predicate act for RICO purposes, defeating the RICO claim.").

[26] *Cf. Whaley v. State*, 343 Ga. App. 701, 704 (1) (808 SE2d 88) (2017) (affirming conviction for violation of Georgia RICO statute via a pattern of theft when there was, *inter alia*, evidence that funds were deposited into defendant's personal account via checks written by his girlfriend from accounts owned by company for which they both worked).

16

they were initially requested by a third party.[27] At most, the Lodge points to speculative evidence as to what Hattaway *should* have known to identify Riddle's purported loans as fraudulent, but "the law does not authorize a finding that conspiracy exists merely because of some speculative suspicion."[28] The Lodge's suggestions that Hattaway knew or should have known the loans were fraudulent, then, are all based upon "mere conjecture and speculation that cannot defeat summary judgment in the face of the uncontroverted evidence that Hattaway prepared the tax returns based upon documents provided by Riddle; and the accounting compilations prepared by Hattaway all included the following statement: "A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance

---

[27] *Cf. Connally v. State*, 265 Ga. 563, 563 (2) (458 SE2d 336) (1995) (holding sufficient evidence supported trustee's conviction for theft by conversion when he "never formally documented the alleged loans; he concealed his actions from the grantors and beneficiaries of the trusts; he failed to report the loans on his own sworn financial statements; and later, he created promissory notes, backdated them, and altered a cleared check to make it appear that the transactions were loans").

[28] *Duvall v. Cronic*, 347 Ga. App. 763, 774 (2) (c) (i) (820 SE2d 780) (2018); *accord Summit Auto. Grp., LLC v. Clark*, 298 Ga. App. 875, 880 (2) (681 SE2d 681) (2009); *Roberts v. Lane*, 210 Ga. App. 10, 12 (1) (435 SE2d 227) (1993).

17

on them." Additionally, further evidence showed that Hattaway provided Riddle, the Lodge treasurer, with the tax returns, and no other Lodge officers ever requested to see the tax returns or any other financial documents in Riddle's possession—at least prior to Montgomery's tenure as Worshipful Master—because Riddle was trusted "unequivocally."[29] Importantly, the Estate offered uncontroverted expert testimony that Hattaway correctly accounted for and reported the Riddle loans, and that, had any officer other than Riddle reviewed the financial documents, they would have been aware of the loans as reported by Hattaway. In short, the evidence proffered by the

---

[29] *Mannion & Mannion, Inc. v. Mendez*, 355 Ga. App. 28, 32 (842 SE2d 334) (2020) (explaining that "evidence [that] is mere conjecture and speculation . . . cannot defeat summary judgment in the face of . . . uncontroverted evidence" to the contrary); *see Charles v. Glover*, 258 Ga. App. 710, 711 (574 SE2d 910) (2002) ("An inference cannot be based on evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. A finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." (punctuation omitted)). In an expert affidavit submitted by the Estate, a certified public accountant averred that "[a]ny reasonable review of the tax returns [and financial reports] by the officers of the [Lodge] would have disclosed the amounts of money transferred to Dwight Riddle for each year." He further opined that following an investigation into the Lodge's policies and procedures for the relevant years, the Lodge "failed to have any reasonable practices to prevent the treasurer of the organization from taking money from the corporation." This evidence was uncontroverted, and it is undisputed that no officers other than Riddle ever looked at or possessed the tax returns or other financial documents because Riddle was so unquestioningly trusted in his role as treasurer.

Lodge does *not* make it *less probable* that Hattaway had no intent to aid Riddle in the theft of Lodge funds, and thus, the trial court did not err in granting summary judgment in favor of the Estate.[30]

2. Relatedly, the Lodge maintains the trial court erred in granting summary judgment to the Estate on the basis that the Lodge's officers failed to exercise due diligence to discover Riddle's theft of funds. But more specifically, the trial court concluded that the alleged misrepresentations by Hattaway—*i.e.*, Hattaway's alleged predicate offenses—were not the proximate cause of the Lodge's loss or damages because it failed to have in place any reasonable measures to check Riddle's work as treasurer. But we need not reach this enumeration of error because, as discussed *supra*, we conclude the trial court properly granted summary judgment on the ground that there is no genuine issue of material fact as to whether Hattaway committed a predicate act for purposes of Georgia's civil RICO Act.

3. Finally, the Lodge argues the trial court erred in granting summary judgment on the basis that the statute of limitation ran prior to the Lodge filing suit against the Estate. But once again, we need not address this alternative basis for the grant of

---

[30] *See supra* note 25 & accompanying text.

summary judgment because we have affirmed the trial court's decision for the reasons set forth in Division 1, *supra*.

For all these reasons, we affirm the trial court's grant of summary judgment in favor of the Estate.

*Judgment affirmed. Mercier and Markle, JJ., concur.*