A03A1674. SAXON v. THE STATE.
(597 SE2d 608)

SMITH, Chief Judge.

This criminal appeal arises from a 53-count indictment. Albert Lawrence Saxon and Sherry Busby were charged with criminal RICO (Count 1), entering an automobile with intent to commit theft (Counts 2-13), financial transaction card theft (Count 14), financial transaction card fraud (Counts 15-16), and forgery in the first degree (Counts 17-49). Each was charged separately with making a false statement (Counts 50, 51). Saxon was also charged in separate counts with forgery in the first degree (Counts 52, 53). The charges arose out of a series of car break-ins that occurred between February 17 and May

---

[1] *Walker v. State*, 258 Ga. App. 354 (574 SE2d 317) (2002).

15, 1998, when the women victims temporarily exited their cars to carry their children into or pick them up from day care or school. Numerous purses were stolen, and many checks taken from the purses were used almost immediately after the break-ins. Saxon and Busby were apprehended after the police received a call concerning a car believed to have been involved in thefts on school property. Saxon was driving the car, and Busby was a passenger. Saxon was convicted of the RICO charge (Count 1), making a false statement (Count 51), and both counts of forgery (Counts 52-53). His motion for new trial as amended was denied, and he appeals, raising several contentions. We find no reversible error, and we affirm.

Construed in favor of the jury's verdict, the record shows that approximately two weeks after Saxon and Busby were arrested, Saxon made a statement to Detective Ronnie Carter, then an investigator with the Savannah Police Department. Carter testified that he drove Saxon "to particular locations and let him describe what happened at those areas." The statement was recorded on audiotape and played for the jury. Saxon recounted to Carter the manner in which he became involved with Busby. He stated that Busby "had been doing daycares with another person" and later "talked me into doing it." He explained that Busby targeted day care centers "because the cars were unlocked and . . . it was an easy way to get money." After Busby stole a purse, she and Saxon would immediately go to a bank, where Busby "would present the ID and forge the check." They also purchased items from retail stores and sold those items to drug dealers.

Saxon admitted that he accompanied Busby when she broke into vehicles at three specific day care centers. He acknowledged that he had done this "so many times" that he could not remember where he was when particular cars were broken into. He credited his lack of memory to the fact that "[d]uring the time we were breakin' into those vehicles, we were intoxicated on cocaine and were just trying to get money for our next fix." He stated that he was not with Busby every time she broke into a vehicle but also that he "was with her most of the time."

Saxon also described several instances in which he accompanied Busby when she forged checks. He remembered one or two instances of "passin' a check" at a particular gas station. He stated that Busby "passed a check for gasoline." Saxon knew that the checks were written on the accounts of other people. He remembered the name of one account holder but not the other used at the gas station, stating, "I don't remember the names of the people. There was [sic] so many people." Saxon also recalled that Busby wrote a check at a Wal-Mart and two more checks at another gas station. He testified that Busby cashed checks at two other grocery stores and that he remembered

Busby going into a takeout pizza restaurant and "passing a check for pizza." He stated that he remembered going to a particular bank and Busby "writing a check and sending it in and getting money back." Saxon also admitted that he used a stolen bank card to obtain money from an automated teller machine.

Like Saxon, Busby made an audiotaped statement, which was played for the jury. She too accompanied Carter to various day care centers where she had broken into vehicles and to establishments where she had forged checks taken from the purses she had stolen from those vehicles. She stated that she and Saxon "focused" on day care facilities because "we knew a lot of times that the lady would leave her car door unlocked." She recounted two separate thefts on different days against different victims at one particular facility. She stated that Saxon accompanied her each time she broke into those vehicles. She also described three other similar thefts. Although she stated that Saxon was not present when she committed one of these thefts, at one point during her statement, Carter asked, "Well, just to clear this up, every vehicle that you broke into Lawrence Saxon was with you?" and Busby responded in the affirmative. She also admitted that Saxon "knew in advance what [she] was planning on doing."

Busby identified several grocery or retail stores and gas stations at which she had "passed" stolen checks. She stated that she wrote "a lot of [one victim's] checks at all different places." She also stated that Saxon took money from a victim's account, using the victim's personal identification number written in the back of her checkbook. She admitted that Saxon accompanied her to a particular bank where she forged checks "more than one time."

Busby pled guilty to Count 1 and testified at trial, a trial which occurred approximately three years after the defendants' arrests. Her testimony concerning Saxon's involvement in the crimes was contradictory. She admitted that she had previously told two detectives that she had stolen purses and forged checks and that Saxon accompanied her "during all of this activity." When asked at trial if she had "said truthfully that Lawrence Saxon" accompanied her during the crimes, she responded in the affirmative. In contrast to her statements to the police, however, Busby testified a number of times at trial that she did not remember specific details of the crimes she committed. At trial, she seemed to remember clearly that Saxon was *not* with her every time she broke into the vehicles, stole purses, and later forged checks. She testified that when the crimes were committed, she and Saxon "were only together a few times. I know the people that took me to get the pocketbooks and it wasn't Lawrence Saxon." And in contrast to her testimony on direct examination, she testified on cross-examination that she had made an untruthful statement to the police concerning Saxon's involvement in the crimes. She stated

that she was in withdrawal from heroin and crack cocaine when she first talked to the police.

1. In related enumerations, Saxon contends that the jury's guilty verdict on the RICO count was rendered ambiguous by the trial court's failure to instruct the jury that it must unanimously agree as to which two or more predicate acts had been proven by the State beyond a reasonable doubt.

In order to address Saxon's arguments, we must consider the indictment, the verdict form, and the trial court's charge to the jury. "Part A" of Count 1 of the indictment charges Saxon and Busby with a RICO violation in that they participated in an "enterprise through a pattern of racketeering activity consisting of entering an automobile with intent to commit theft, financial transaction card theft, financial transaction card fraud, and forgery in the first degree, as more particularly described in paragraphs (1) through (48) of Part C of this Count." "Part C" contains 48 subparts, with each subpart detailing the crimes allegedly committed by Saxon and Busby. These subparts correspond with separate Counts 2 through 49. We note that the State withdrew from the jury's consideration allegations of the predicate acts contained in three subparts of Count 1, as well as the three separate counts that corresponded to those subparts.

With the exception of the withdrawn or inapplicable counts, the verdict form separately lists all counts against Saxon, followed as to each by the statement, "We the jury find the Defendant _____." The word "guilty" is handwritten in the blanks next to Count 1 (RICO), Count 51 (false statement), and Counts 52-53 (forgery in the first degree). The blanks next to Counts 2-49 have nothing written in them.

The trial court instructed the jury regarding the definition of RICO, tracking the relevant language of OCGA §§ 16-14-3 and 16-14-4. It further charged the jury that "[t]he State is not required in the first part to prove all of the predicate offenses alleged in the indictment, but is required to prove only two beyond a reasonable doubt." The court then gave guidance to the jury as to the order of its deliberations. It instructed the jury to begin deliberating with "Count 1 which is the RICO count. If you find the Defendant not guilty of that charge, then you'll just move on to Count 2 and you'll just keep going through all the different counts." Alternatively, the court charged the jury that if it found Saxon guilty of the RICO charge, "you're going to skip over a lot of charges. You will skip over Counts 2-49" in addition to an inapplicable count "and you will move on to Counts 51, 52, 53." The court reiterated, "if you find him not guilty of Count 1, just keep on moving through the indictment with the exception of the counts you shouldn't be considering. However, if you find him guilty of Count 1, then you skip everything until you get to Counts 51 and you would

consider then just Count 51, 52, and 53." The court also instructed the jury that its verdict must be unanimous.

We do not agree that the trial court's charge constituted reversible error. We first note that Saxon's counsel did not request an instruction that the jury must specify which two predicate acts were proven beyond a reasonable doubt, and he did not object to the verdict form. In fact, he helped draft it. In addition, among other instructions in its lengthy charge, the trial court fully instructed the jury on the presumption of innocence, the State's burden of proof, and the fact that mere presence at the scene of a crime cannot support a conviction. As discussed above, the trial court then carefully instructed the jury as to the manner in which it was to proceed with its deliberations on the RICO count and on the remaining charges.

To sustain its burden on the RICO charge, the State was required to show that Saxon violated OCGA § 16-14-4, which provides in relevant part:

> (a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.
> (b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

Id. A person participates in a "pattern of racketeering activity" when he or she engages "in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." OCGA § 16-14-3 (8) (A). The term " '[r]acketeering activity' means to commit" a number of crimes chargeable by indictment under the laws of Georgia, as set forth at OCGA § 16-14-3 (9) (A) (i)-(xxxvii), including the crimes of forgery and theft. OCGA § 16-14-3 (9) (A) (viii), (ix).

The State presented overwhelming evidence of Saxon's participation in more than two of the crimes enumerated in OCGA § 16-14-3 (9) (A). Even though Busby's trial testimony was inconsistent, she had previously stated that Saxon accompanied her every time she broke into a vehicle and that he was aware that she intended to steal purses from the vehicles. She and Saxon would use money stolen from the purses to purchase drugs. More importantly, Saxon himself freely admitted his participation in several thefts in day care parking lots,

and he repeatedly drove Busby to establishments, either banks or retail stores, where she forged stolen checks. He too admitted that they used the proceeds from their crimes to buy drugs. The crimes were not "isolated incidents." OCGA § 16-14-3 (8) (A). Instead, Saxon and Busby repeatedly targeted a very specific group of victims, and their mode of operation at each location was strikingly consistent.

Saxon correctly points out that it is not possible to determine from the trial court's instructions and the verdict *which specific* predicate acts the jury concluded Saxon committed. Nevertheless, we cannot conclude that the verdict was ambiguous.

> Verdicts are to have a reasonable intendment, and are to receive a reasonable construction, and are not to be avoided unless from necessity. Accordingly, a verdict may be construed in the light of the issues actually submitted to the jury under the charge of the court; and if, when so construed, it expresses with reasonable certainty a finding supported by the evidence, it is to be upheld as legal.

(Citations and punctuation omitted.) *Henson v. Scoggins*, 203 Ga. 540, 541 (2) (47 SE2d 643) (1948).

The overwhelming evidence against Saxon shows that on numerous occasions he committed the offenses of theft and forgery, which are enumerated in OCGA § 16-14-3 (9) (A) as crimes that constitute " '[r]acketeering activity.' " In light of this evidence, we find that the jury's verdict "expresses with reasonable certainty" its finding of guilt on the RICO charge and that the State met its burden of proving violation of OCGA § 16-14-4 beyond a reasonable doubt. Contrary to Saxon's contentions, we note that the indictment in this case does not specifically allege the dates stated therein as material. Consequently, the State was not required to prove the specific dates of the incidents. See *Alexander v. State*, 274 Ga. 787, 789 (1) (b) (561 SE2d 64) (2002). The verdict was not ambiguous, and we find no reversible error with respect to the trial court's RICO instructions.

2. Relying on *Crosby v. State*, 150 Ga. App. 555 (258 SE2d 264) (1979), Saxon complains of the following portion of the trial court's charge on accomplice testimony. "I . . . charge you the testimony of one accomplice may be supported by testimony of another accomplice. Whether or not the testimony of one accomplice does, in fact, support the testimony of another accomplice is a matter for you, the jury, to determine." A similar charge was given in *Crosby*, and only one "accomplice" testified. Although we stated that the charge was a correct principle of law in the abstract, id. at 557, we found the charge to be potentially confusing and misleading. We concluded that the

"inapplicable instruction . . . authorized the jury to reach a finding of guilty by a theory not supported by the evidence." Id. at 558 (2).

As in *Crosby*, only one accomplice testified in this case, and the trial court charged the jury that the testimony of an accomplice could be corroborated by that of another. But a critical distinction exists between this case and *Crosby*. In that case the sufficiency of the corroboration of the accomplice's testimony was "[o]ne of the vital issues at trial." Id. at 556 (2). Here, however, the sufficiency of the corroboration of Busby's testimony was hardly a vital issue, given Saxon's own incriminating statements. Busby's testimony was amply corroborated, and we cannot conclude that a significant danger exists that Saxon was convicted on a theory unauthorized by the evidence. Harm as well as error must be shown to warrant reversal. *Matthews v. State*, 268 Ga. 798, 803 (4) (493 SE2d 136) (1997). Saxon has not shown that he was harmed by the trial court's charge, and we therefore find no reversible error.

We note Saxon's argument that the trial court's erroneous charge on accomplice testimony constituted an improper expression as to Saxon's guilt. Saxon correctly argues that a trial court improperly expresses its opinion of the defendant's guilt if it "instruct[s] the jury that a witness who testified as to the defendant's guilt and admitted his participation in the crime would be an accomplice of the accused." (Citation and punctuation omitted.) *Ladson v. State*, 248 Ga. 470, 477-478 (11) (285 SE2d 508) (1981). But here, the trial court did not instruct the jury that Busby was Saxon's accomplice. Rather, it instructed the jury that whether a witness was an accomplice was a question for the jury to determine.

3. Saxon contends that the trial court erred in charging the jury the law related to conspiracy. He objected to the charge "in its entirety. . . . [C]onspiracy and then party to the crime, we're trying two different theories here. Nothing was ever charged in the indictment or anything like that of any conspiracy whatsoever." Saxon makes a number of arguments with regard to the instruction on conspiracy. As best we understand these arguments, they are summarized by his contention that "the indictment did not put him on notice that he could be held liable through a separate and distinct offense of conspiracy to commit a crime." But Saxon was not *convicted* of conspiracy to commit the crime. The trial court simply gave the State's requested charge on this subject. It is well settled that "a conspiracy may be proven and a jury charge may be given on conspiracy and parties to a crime even though a defendant is not indicted under those theories. [Cits.]" *Huey v. State*, 263 Ga. 840, 842 (3) (439 SE2d 656) (1994). To establish a conspiracy, the State need prove only

that two or more persons tacitly came to a mutual under-
standing to accomplish or to pursue a criminal objective. A
conspiracy may be inferred from the nature of the acts done,
the relation of the parties, the interest of the alleged con-
spirators, and other circumstances. When the evidence tends
to show a conspiracy, a charge upon the subject is not error
even if not alleged in the indictment. Indeed, the trial court
has a duty, even in the absence of a request, to charge the jury
the law as to every substantial and vital issue in the case.

(Citations and punctuation omitted.) *Brown v. State*, 269 Ga. 67,
69-70 (3) (495 SE2d 289) (1998).

In addition to the RICO count, Saxon was charged with substan-
tive counts of entering an automobile with intent to commit theft,
forgery in the first degree, and financial transaction card theft and
fraud. Ample evidence was presented showing that Saxon and Busby
"tacitly came to a mutual understanding to" commit these crimes.
*Brown*, supra at 69. As argued by the State, the evidence showed that
Saxon and Busby "both planned and carried out the series of car
break-ins and thefts that resulted in the criminal charges. The
statements of both defendants indicated that there was an agreement
on exactly how the crimes would be committed and which of the
defendants would do what, during this crime spree." The evidence
authorized the charge, the instruction was clear, and reversal is not
warranted.

4. Saxon contends that he was denied effective assistance of
counsel in several respects. Under the standard of *Strickland v.
Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), to
prevail on this claim, Saxon must show that his trial counsel was
deficient and that but for this deficiency, the outcome of his trial
would have been different. *Marshall v. State*, 275 Ga. 740, 745 (10)
(571 SE2d 761) (2002). He must meet both prongs of the *Strickland*
standard. *Nikitin v. State*, 257 Ga. App. 852, 857 (572 SE2d 377)
(2002).

(a) Saxon argues that trial counsel rendered ineffective assis-
tance because he failed to file a motion to suppress based on Saxon's
illegal arrest. Mike Allen, an officer with the Chatham County Police
Department, described Saxon's arrest during the hearing on Saxon's
motion for new trial. He testified that he received a dispatch advising
him that the headmaster of a local school was following a vehicle,
which was "maroon color, older model, LTD Ford." Allen understood
from the dispatch that the headmaster was "on a cell phone to the
dispatcher asking us to get to them and try to stop this vehicle." Allen
knew the headmaster by name. After receiving the initial dispatch, he
received "multiple communications" concerning the direction the

vehicle was headed. He spotted the vehicle approximately ten to fifteen minutes after receiving the dispatch. Allen observed no traffic violations and "stopped the car based on the radio contact." After he stopped the car, Allen determined that Saxon "did not have a driver's license and he gave me a false name."

The headmaster, Larry Berry, testified at trial that just before student dismissal time on May 15, 1998, he walked outside the school to observe the area "because we had had a problem reported a couple of times about some purses taken on school grounds," and he had received reports from his staff concerning a suspicious car on campus. He saw a vehicle in the student parking area fitting the description he had been given. A man and a woman were inside the car. The car was stationary for three or four minutes, and it then moved toward the circular student pickup line. It moved "very slow in the line of traffic but pull[ed] up by cars that were parked near the curb." The people inside "were looking over into the cars, not as if they were looking for their child."

Becoming increasingly suspicious, Berry "knew that at that point I had to take some action because I felt like these were the people that had been trespassing on our campus previously." He approached a teacher preparing to leave the school and asked if he could sit in her vehicle in order to further observe the suspicious car. Berry testified that the car he was watching began to leave the parking lot "by going out the wrong way of the one way entrance. Then I knew that they were in a hurry to get out of there." At Berry's request, the teacher followed the car. Berry called the business manager at the school and instructed the manager to call the Chatham County Police Department because "I felt like we had someone that shouldn't have been on our campus and felt like that they were . . . fixing to commit a crime." He gave the license tag to the business manager and continued to follow the car for several minutes. At one point, he observed the car "going at a high rate of speed." He testified that the car "cut in front of [a] school bus that had its stop sign out [and] hit the curb with both right wheels of the car" before it sped away. Berry told the business manager, who was on another telephone line with the police dispatcher, "that it looked like he was getting away and that if they could get some deputies out there, we needed it right now." The suspicious car was eventually stopped by the police. Berry identified Saxon as the driver.

Saxon argues that because Allen never spoke directly with the headmaster, "the caller was nothing more than an anonymous tipster," that Allen did not have articulable suspicion justifying the stop, and that the traffic stop and subsequent arrest were therefore illegal. He also points out that Allen did not observe any traffic violations before he stopped Saxon's vehicle.

Although Allen did not personally talk with Berry and did not personally observe any traffic violation, these facts do not render the traffic stop illegal. "Information received by an officer from a dispatcher's call may provide articulable suspicion to perform an investigative stop." (Footnote omitted.) *Hudson v. State*, 253 Ga. App. 210, 211 (558 SE2d 420) (2002). Berry was not an anonymous tipster, and the information received by Allen was hardly "a vague tip from an anonymous caller." *Brooks v. State*, 208 Ga. App. 680, 682 (1) (431 SE2d 466) (1993). Instead, the information came from a "known, law-abiding concerned citizen who testified at trial and who on the day in question had the opportunity to personally observe" Saxon's suspicious activities. *Hudson*, supra at 211. Under the totality of the circumstances of this case, we conclude that Allen had a reasonable, articulable suspicion that Saxon was involved in criminal activity sufficient to conduct the traffic stop. See *Sayers v. State*, 226 Ga. App. 645 (487 SE2d 437) (1997). Here, as in *Moon v. State*, 252 Ga. App. 796, 799 (2) (a) (557 SE2d 442) (2001), we conclude that "a motion to suppress on the basis as alleged would be meritless and cannot serve as a basis for ineffective assistance of counsel."

(b) Saxon's remaining allegations of ineffectiveness do not meet both prongs of the *Strickland* standard and therefore cannot serve as a basis for reversal. See *Nikitin*, supra at 857.

*Judgment affirmed. Ruffin, P. J., and Miller, J., concur.*

DECIDED MARCH 25, 2004 —

*Jackson & Schiavone, Steven L. Sparger*, for appellant.
*Spencer Lawton, Jr., District Attorney, Ronald M. Adams, Assistant District Attorney*, for appellee.

