S05A0897. DORSEY v. THE STATE.
(615 SE2d 512)

THOMPSON, Justice.

Sidney Dorsey, a former Sheriff of DeKalb County, Georgia, was convicted of malice murder, two counts of violating the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), violation of oath by a public officer, and theft by taking in violation of duties as a public officer (eight counts), in connection with the shooting death of his newly elected successor in office, Derwin Brown.[1] On appeal, Dorsey primarily challenges his murder conviction on the basis that the State's theory of the case was materially misleading and erroneous, and he asserts that the RICO convictions

---

[1] Derwin Brown was killed on December 15, 2000. The other crimes spanned a period from January 1, 1997 to December 31, 2000. A multi-count indictment was returned on February 22, 2002. Trial commenced on June 14, 2002, and the following charges were considered by the jury: malice murder, violation of Georgia RICO Act (two counts), bribery (two counts), violation of oath by public officer, and theft by taking in violation of duties as a public officer (nine counts). On July 10, 2002, Dorsey was acquitted of the bribery charges and one count of theft in violation of duties as a public officer; he was convicted of the remaining offenses. Dorsey was sentenced on August 15, 2002 to life imprisonment for murder plus a term of 20 consecutive years for one RICO offense, and three consecutive years for violating his oath of office. He received concurrent sentences for each of the remaining convictions. A timely motion for new trial, as amended, was denied on August 11, 2003. A notice of appeal was filed on August 18, 2003. The case was docketed in this Court on February 15, 2005, and oral argument was heard on May 16, 2005.

should be set aside for a variety of reasons. Finding no error, we affirm.

Viewed in a light most favorable to the verdict, the evidence established that from 1996 to 2000, Sidney Dorsey served as Sheriff of DeKalb County. In 2000 Dorsey ran for re-election, but was forced into a run-off, and was subsequently defeated by opponent Derwin Brown. During the campaign, Brown had begun an investigation to uncover corruption that Dorsey had allegedly engaged in during his tenure as sheriff.

In August 2000, after Dorsey was defeated in the election, he met with Shirley McMichael, a bondsperson with whom Dorsey was involved in an extra-marital affair. Dorsey told McMichael that Brown would never assume office as sheriff, that a special election would be held in January, and that Dorsey would be re-elected sheriff. Dorsey placed his hand in the shape of a gun up to his temple to signal Brown's shooting. Shortly after Dorsey lost the run-off election, he likewise told DeKalb County Chief Deputy Clarence Mosely that Brown "would never assume the office," that an interim sheriff would be appointed, and that there would be a special election that Dorsey would ultimately win.

Thereafter, Dorsey summoned Patrick Cuffy to his home. Cuffy was a former employee of Dorsey's private security firm, Security Investigations Division ("SID"), and he had been hired by Dorsey to work in the internal affairs division of the DeKalb County Sheriff's Department. At that meeting, Dorsey handed Cuffy a written note which read, "Kill Derwin Brown."[2] When Cuffy declined to do the deed alone, Dorsey proposed that he solicit the help of three other former SID employees, Melvin Walker, David Ramsey, and Paul Skyers, to carry out the plot. Cuffy met with the other three and told them that Dorsey had requested their participation. They all agreed, and in consideration they received Dorsey's promise that if he were to regain his position as sheriff, each would be given the position they desired in the sheriff's department. Dorsey promised Cuffy that he would "speedily promote [him] through the ranks" and place him in charge of the community relations division.

Cuffy was the go-between who would meet with Dorsey and relay instructions back to the others. The four men conducted surveillance in preparation for the murder. Skyers provided the murder weapon: a Tech 9 millimeter semi-automatic handgun which was modified with a homemade silencer. It was decided that Walker would be the shooter. Over the course of three months they met regularly at night

---

[2] The written note was then destroyed by Dorsey.

near Brown's home with the intention of killing Brown at any time that he was vulnerable.

Dorsey helped protect the murder team from detection. On one occasion, Cuffy parked his sheriff's vehicle at an elementary school near Brown's home and left the vehicle unattended. Around midnight, DeKalb law enforcement officers observed the vehicle and became suspicious because they had seen the same car parked there the previous night. At that point, another vehicle containing several occupants drove up to the school and Cuffy got out. The officers approached Cuffy and asked him for identification. Cuffy replied that he was working on a special assignment for the DeKalb County Sheriff. When Cuffy could not produce identification, he placed a call to Dorsey on his cell phone and handed the phone to the officer. Dorsey informed the officer that Cuffy was working on undercover surveillance for the sheriff's office. As a result of the information provided by Dorsey, the officers released Cuffy.

On December 15, 2000, a few months after Brown won the election and shortly before taking office, Dorsey instructed Cuffy that the shooting "had to be done that evening." The four men met at Cuffy's home, and then drove together to a wooded area near Brown's home, which they had staked out during their surveillance. Skyers remained with the car while the others positioned themselves in wait for Brown to return home. As Brown exited his car and was walking along the driveway of his DeKalb County home, he was shot 12 times and killed. The four perpetrators drove to Cuffy's home where they dismantled the murder weapon; Skyers subsequently tossed it in a drain in Gwinnett County. Within weeks of the murder, Skyers met with Dorsey who asked if the police "were still harassing" him. Skyers told Dorsey that he was in need of money, and Dorsey handed him $1,000 in cash.

After Brown's death, the investigation into Dorsey's misconduct as sheriff intensified. When Cuffy was later arrested on an unrelated charge, he cooperated with the authorities and named Dorsey as the mastermind behind Brown's killing. Skyers also assisted in the police investigation and led officers to the murder weapon.[3] Dorsey was charged in a 53-page indictment with murder, and other crimes stemming from his corruption in office.

The trial evidence revealed an ongoing pattern of theft of services of county personnel, and the unauthorized use of county vehicles and gasoline for personal profit and convenience throughout the entire

---

[3] Cuffy and Skyers testified against Dorsey under grants of immunity.

course of Dorsey's term as sheriff. Dorsey regularly instructed De-Kalb County deputy sheriffs to chauffeur him and his family members to various locations for personal benefit, unrelated to the county's business. These included the daily assignment of picking up Dorsey's children from school, an "everyday activity" which occurred during Dorsey's "entire term" as sheriff. These personal activities generally took place during the employee's normal work hours, and the employee received his regular salary from the county. If the employee was working outside normal work hours, he generally received overtime compensation or was compensated by paid time off. Dorsey repeatedly directed sheriff's employees to repair and maintain his personal family vehicles. In addition, sheriff's employees were required to drive to Chattanooga, Tennessee, and Statesboro, Georgia, on several occasions to assist Dorsey's children with automobile repairs. Dorsey directed a deputy sheriff to accompany him and his family on a four-day trip to Walt Disney World. The deputy was paid his regular salary by the county during that time. Dorsey regularly used the services of an in-house lawyer employed by the sheriff's office to provide personal legal services for himself, his family, and his friends. These services were performed during the employee's regular work day, and the employee received his regular county salary as compensation. Dorsey regularly used on-duty deputies to staff his private security firm. Likewise, these employees received their county salary for performing personal chores for Dorsey.

A jury found Dorsey guilty of malice murder, violations of the Georgia RICO Act (two counts), violation of oath by public officer, and theft by taking in violation of duties as a public officer (eight counts).

### *The Murder Count*

1. Dorsey asserts the murder conviction cannot stand because the State misled the jury when it theorized that Dorsey killed Brown to prevent Brown from investigating and uncovering Dorsey's corruption. In this regard, Dorsey posits that he could not have engaged in any corrupt activities because he had sole discretion to allocate the funds and resources of the sheriff's office. Assuming without deciding that this assertion was properly raised below, see *Jones v. State*, 268 Ga. 12, 15 (5) (483 SE2d 871) (1997), we find the argument to be wholly without merit. It was incumbent upon Dorsey to protect county property from injury and waste; he was not empowered to use the sheriff's department as if it were his own personal domain. OCGA §§ 36-9-8 (duty of sheriff to preserve county property from injury or waste); 15-16-10 (a) (8) (sheriff must perform duties imposed by law); 15-16-19 (b) (sheriff shall receive no compensation except annual salary fixed by law); *Johnson v. U. S. Fidelity &c. Co.*,

93 Ga. App. 336, 340 (91 SE2d 779) (1956) (duties of deputies defined by statute — beyond that, sheriff has no authority over them). See generally *Bd. of Commrs. of Dougherty County v. Saba*, 278 Ga. 176 (1) (598 SE2d 437) (2004) (decision of constitutional officer as to how to spend funds allocated to office falls to the officer *in the exercise of his duties*). Thus, evidence of corruption in the sheriff's office was relevant and admissible, and the prosecution was well within bounds when it theorized that that evidence was the motive for Brown's murder. See *Wall v. State*, 153 Ga. 309 (1) (112 SE 142) (1922) (evidence of motive is always relevant and admissible); *Sterling v. State*, 89 Ga. 807 (15 SE 743) (1892) (prosecutor may advance any theory as to motive which is not absolutely inconsistent with the facts). We also note that the allegations of motive were not limited to theft. The indictment alleged that Dorsey solicited Brown's murder "in an effort both to prevent . . . exposure of corruption . . . and to allow Sidney Dorsey to remain or regain his position as Sheriff of DeKalb County."

The evidence was sufficient for a rational trier of fact to have found Dorsey guilty beyond a reasonable doubt of malice murder under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### The RICO Counts

2. In several enumerations of error, Dorsey submits that the trial court erred in denying his various motions to quash the RICO counts of the indictment, and that his convictions for those offenses are insupportable as a matter of law.

The trial court determined that Dorsey's motions to quash were properly characterized as general demurrers. When analyzing a general demurrer, the question is whether a defendant can admit to the conduct and still be innocent of the crime. *State v. Eubanks*, 239 Ga. 483 (238 SE2d 38) (1977); *Drewry v. State*, 201 Ga. App. 674 (1) (a) (411 SE2d 898) (1991).

> To sustain its burden on the RICO charge, the State was required to show that [defendant] violated OCGA § 16-14-4, which provides in relevant part:
>
> (a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

(b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity. [Cit.]

A person participates in a pattern of racketeering activity when he or she engages in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. OCGA § 16-14-3 (8) (A).

(Punctuation omitted.) *Saxon v. State*, 266 Ga. App. 547, 551 (1) (597 SE2d 608) (2004). " 'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment" under certain specified categories of laws. OCGA § 16-14-3 (9) (A) (i) through (xxxviii). These are the qualifying crimes, known as predicate offenses. See also *Caldwell v. State*, 253 Ga. 400, 402 (1) (321 SE2d 704) (1984).

In Dorsey's case, two RICO counts were submitted to the jury. These counts alleged: (1) that through a pattern of racketeering activity, Dorsey did "acquire and maintain . . . interest in or control of . . . personal property" (OCGA § 16-14-4 (a)); and (2) Dorsey "was associated with an enterprise, and did through a pattern of racketeering activity . . . conduct and participate in the enterprise" (OCGA § 16-14-4 (b)). The RICO counts were supported by a detailed statement of the alleged enterprise,[4] the pattern of racketeering, pecuniary gain to the defendant, and the resulting physical injury. The indictment alleged six categories of racketeering activity, totaling fifty charged predicate acts, as follows: Category One consists of twenty-eight acts of theft; Category Two consists of six acts of bribery; Category Three consists of four false statements; Category Four consists of the act of soliciting Cuffy and his cohorts to kill Derwin Brown; Category Five consists of nine acts involving murder, i.e., acts in furtherance of Brown's murder; and Category Six consists of two acts of witness tampering.

In denying the general demurrers to the RICO counts, the trial court properly determined that the numerous predicate acts alleged in the indictment reveal an interrelated pattern of activity by and through the sheriff's office during Dorsey's tenure.

---

[4] I.e., the DeKalb County Sheriff's Department.

(a) For a host of reasons, Dorsey argues that the Category One theft racketeering acts as charged in the indictment should have been quashed by the trial court, and, therefore, cannot support the RICO convictions. Pretermitting that question, we are persuaded that both RICO counts are supported beyond a reasonable doubt by at least two other crimes charged as predicate offenses. "Evidence of two predicate acts will sustain the RICO conviction . . . [where] the evidence authorized the jury to find that [defendant] committed at least two predicate acts . . . [w]e need not consider the remaining predicate acts charged." *Jones v. State*, 252 Ga. App. 332, 333 (1) (556 SE2d 238) (2001). This is true even where certain predicate offenses were improperly charged in the indictment; if two remaining predicate offenses were proven beyond a reasonable doubt, the proof was sufficient to support a RICO conviction. *Bethune v. State*, 198 Ga. App. 490 (1) (402 SE2d 276) (1991). Accord *Thompson v. State*, 211 Ga. App. 887 (1) (b) (440 SE2d 670) (1994) (unnecessary for appellate court to address possible defects in certain alleged predicate acts where removal of those acts leaves numerous other predicate acts which properly support RICO conviction). See also *Mosley v. State*, 253 Ga. App. 710, 712 (1) (560 SE2d 305) (2002) ("RICO conviction requires proof that a defendant has committed two or more offenses of the kind included in the RICO statute; it does not require the State to prove all of the alleged predicate offenses"). Even with the removal of the Category One predicate theft acts, Dorsey's two RICO convictions are overwhelmingly supported.[5] *Bethune*, supra; *Thompson*, supra.

(b) Dorsey also asserts that the State failed to offer evidence that he acquired personal property and money "through a pattern of racketeering." It is sufficient that the predicate acts be related to each other and that one or more of the acts which form the *pattern* result in the defendant acquiring or maintaining the prohibited control. See *Caldwell*, supra at 402 (1). "Here, there is a clear connection between the enterprise the Sheriff's Office and the predicate acts committed by Sheriff [Dorsey]. . . . The offenses were a part of a scheme to use the Sheriff's Office for illicit profit-making activities." *United States v. Welch*, 656 F2d 1039, 1062 (5th Cir. Tex. 1981) (interpreting the same provision, "through a pattern of racketeering activity," contained in the federal statute).

(c) Dorsey challenges the Category Five predicate offenses, each concerning an "act . . . involving murder." The basis for the challenge

---

[5] This ruling obviates the need to address other enumerations of error which similarly are premised on the assertion that the theft acts were improperly considered by the jury for RICO purposes.

is that a preparatory act, which standing alone may not be criminal, cannot constitute a RICO predicate. Georgia's RICO statute, however, belies that claim. While racketeering activity must have a crime as its objective, OCGA § 16-14-3 (9) (A) includes within the definition of "racketeering activity" "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment." OCGA § 16-14-3 (9) (B) further defines "racketeering activity" as "any act or threat involving murder." The Category Five acts alleged that Dorsey "did commit acts involving murder," in that he met with the four co-conspirators for the purpose of planning Brown's murder; that the co-conspirators conducted surveillance and obtained firearms in furtherance of that objective; that Dorsey covered for Cuffy when Cuffy was questioned by law enforcement during the surveillance efforts; that Dorsey employed the co-conspirators in the sheriff's office as consideration for their participation in the murder plot; and that Dorsey discussed alibis with them after the commission of the murder. These are acts of attempt and solicitation involving murder, which clearly fall within the scope of OCGA § 16-14-3 (9) (A) and (B). See generally *United States v. Miller*, 116 F3d 641, 675 (2d Cir. N.Y. 1997) (interpreting federal RICO statute which defines racketeering activity as encompassing "any act . . . involving murder," 18 USC § 1961 (1) (A), to include an act which need not be murder, so long as it directly concerns murder).

(d) Dorsey submits that an alleged predicate act must be stricken if it does not directly facilitate the applicable RICO offense. Under this analysis, for example, any act alleged as a predicate offense to OCGA § 16-14-4 (a) must fail if it does not directly facilitate the obtaining of "property." Under our RICO statute, however, a "pattern of racketeering activity" means "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents . . . or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." OCGA § 16-14-3 (8) (A). We read the statute to mean that acts of racketeering may be related despite having different objectives as is evidenced by the legislature's inclusion of such crimes as influencing witnesses, OCGA § 16-14-3 (9) (A) (xiv); perjury, OCGA § 16-14-3 (9) (A) (xv); and tampering with evidence, OCGA § 16-14-3 (9) (A) (xvi).

(e) As stated previously, proof of two but separate related acts is sufficient to establish a pattern of racketeering activity. *Bethune*, supra.

(f) We reject Dorsey's merger argument. The two RICO offenses contain different elements and require independent proof of each element. Nor is merger required for any of the other reasons asserted.

3. Dorsey also asserts that the trial court erred in denying his motions for directed verdict of acquittal with regard to the substantive counts of theft by taking in violation of his duties as a public officer, OCGA §§ 16-8-2 and 16-8-12 (a) (3).[6] The standard for reviewing a denial of a motion for a directed verdict of acquittal is the same test to be used when the sufficiency of the evidence is challenged, i.e., under the rule of *Jackson v. Virginia,* supra, whether the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense. *Woods v. State,* 269 Ga. 60 (2) (495 SE2d 282) (1998); *Lee v. State,* 247 Ga. 411 (6) (276 SE2d 590) (1981).

Dorsey argued below and reasserts on appeal that the prosecution failed to prove a theft from the county because: (1) the deputies who were doing Dorsey's bidding were not county employees but were employed by the sheriff's office; (2) Dorsey had unfettered discretion to assign deputies; and (3) the sheriff had sole discretion to decide how to spend the funds allocated by the county. Thus, if Dorsey was stealing, "he was only stealing from himself." These arguments are specious at best. Dorsey's conduct was "so far outside the realm of acceptable police behavior," *Poole v. State,* 262 Ga. 718, 719 (425 SE2d 655) (1993), that any rational trier of fact could have found proof beyond a reasonable doubt of the eight counts of theft by taking in violation of Dorsey's duties as a public officer. *Jackson v. Virginia,* supra.

*Jury Instructions*

4. Dorsey submits that the trial court failed to administer proper jury instructions.

(a) The trial court did not err in failing to instruct the jury that property taken by a public officer in breach of his duties is punishable as a felony. OCGA § 16-8-12 (a) (3); *Hanson v. State,* 232 Ga. App. 352 (3) (501 SE2d 865) (1998). A jury concerns itself with guilt or innocence, not punishment. See *State v. Benton,* 278 Ga. 503 (604 SE2d 169) (2004); *Joyce v. State,* 235 Ga. App. 167 (509 SE2d 85) (1998).

(b) Dorsey asserts the trial court should have charged the jury that an affirmative defense to a prosecution for theft arises if defendant "[a]cted under an honest claim of right to the property or service involved or under a right to acquire or dispose of it as he did." OCGA § 16-8-10 (2). In this regard, Dorsey posits that he acted under the assumption that, as sheriff, he was entitled to use the county's

---

[6] OCGA § 16-8-12 (a) (3) elevates the crime of theft by taking under OCGA § 16-8-2, to a felony if the property "was taken by . . . an officer or employee of a government."

resources. But simply put, Dorsey could not have had an honest claim of right to the county's property. See *Poole,* supra (policeman's conduct in pawning confiscated handgun to get money to pay personal water bill was "far outside the realm of acceptable police behavior"); *Whitley v. State,* 176 Ga. App. 364 (336 SE2d 301) (1985) (even though police officers were following an accepted police practice, it was proper to prosecute police officers for theft of city property when they served confiscated alcoholic beverages at a police function); *Mathis v. State,* 147 Ga. App. 148, 149 (3) (248 SE2d 212) (1978) (not error to fail to charge "claim of right" where defendant merely denied any intent to deprive owner of property).

(c) It was not error to refuse to charge the jury that materiality is an essential element of each prong of a false statement and writings offense.[7] *Bullard v. State,* 242 Ga. App. 843, 848 (7) (530 SE2d 265) (2000). OCGA § 16-10-20 makes materiality only an element of the first prong of the offense. The trial court's instruction mirrored the language of OCGA § 16-10-20, which contains no express materiality requirement as to the final two prongs. *Bullard,* supra. The court properly declined to add such language.

5. Dorsey submits that the trial court erred in refusing to allow him to review jury questionnaires and petit juror information so he could properly investigate a possible issue of juror misconduct on appeal.

Counsel for a convicted defendant is entitled to the list of jurors who served in the case, if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. See generally *People v. Jones,* 17 Cal. 4th 279 (70 Cal. Rptr. 2d 793) (1998).

At a post-trial hearing to consider Dorsey's request, there was no showing or even any allegation of juror misconduct. Nonetheless, the court offered to give Dorsey's counsel redacted questionnaires, eliminating the names and signature pages of the jury members. The judge further offered to furnish relevant identifying information and to hold a qualification hearing upon an adequate showing of a particular juror's misconduct. The court refused to grant counsel's unsupported request for unredacted questionnaires especially in light of a prior incident during trial when Dorsey copied and concealed on his person a list of pre-qualified jurors' names, Social Security numbers, and addresses, which was confiscated by a deputy during a search.

After a subsequent hearing on Dorsey's motion for new trial, the trial judge concluded that Dorsey failed to provide adequate evidence

---

[7] This offense was listed as a predicate act for RICO purposes.

that jury misconduct had taken place and found that the evidence provided was based on "contradictory and confusing hearsay." See generally *Sears v. State*, 270 Ga. 834 (3) (514 SE2d 426) (1999); *Moton v. State*, 256 Ga. App. 594 (2) (569 SE2d 264) (2002). The court refused to allow Dorsey access to the jurors' information because of "safety concerns and fear of harassment of [the] jury." Because the court engaged in an elaborate pre-qualification process for each juror, gave the jury extensive instructions on their required conduct during trial, and provided them an opportunity to be interviewed by counsel after trial (which the jurors refused), the court found that Dorsey's allegations of misconduct were unsupported and unwarranted. A motion for new trial because of improper juror conduct is addressed to the sound discretion of the trial judge, and unless there is an abuse of discretion, an appellate court will not upset the trial court's determination. *Dryman v. Watts*, 268 Ga. App. 710 (2) (603 SE2d 51) (2004). Under the circumstances, Dorsey failed to show an abuse of discretion. Id.

6. After conviction, defense counsel requested that Dorsey remain housed in a county facility so as to give counsel access to defendant for purposes of prosecuting his appeal under OCGA § 42-5-50 (c). While that statute is couched in mandatory language, see *Helmeci v. State*, 230 Ga. App. 866 (5) (498 SE2d 326) (1998), the trial court is empowered to order otherwise "where an issue is properly raised before the trial court regarding jail security or other matters involving administration of the jail." *In re Irvin*, 254 Ga. 251, 253 (328 SE2d 215) (1985). Here, the trial court initially granted the request and then reconsidered after an evidentiary hearing. The court found that Dorsey's status as a former law enforcement officer "created an extraordinary situation that required . . . a complex and secretive procedure rotating his placement in metropolitan jails. That procedure is dangerous, difficult to coordinate, and a burden on county resources." The parties stipulated to the foregoing as well as to the fact that Dorsey was a high security risk. There was no error. Id.

7. We have considered Dorsey's remaining enumerations of error, and find that they are without merit.

*Judgment affirmed. All the Justices concur, except Hunstein, J., not participating.*

FLETCHER, Chief Justice, concurring.

I concur with the majority opinion, but write separately to emphasize my opinion that the State has created a dangerous precedent by its choice to utilize such a broad and vague definition of "theft" in its charges against Dorsey. By failing to distinguish those acts which undoubtedly do merit criminal charges from those that occur everyday as a matter of fact in almost any public office, the

State has created the risk that public officers may face selective political prosecutions for minor occurrences.

The evidence unmistakably shows that Dorsey treated the De-Kalb County sheriff's office as his own personal fiefdom. Throughout his tenure, Dorsey forced his deputies to foresake their job duties to do his personal bidding, while they were ostensibly working for, and being paid by, the county. Undoubtedly, Dorsey's efforts to utilize county employees for his own pecuniary gain, such as staffing county deputies at his private security firm while they were being paid by the county, merits criminal prosecution. In its unbridled zeal to convict Dorsey, however, the State failed to provide any cognizable distinction between those actions which would constitute a legitimate "theft of services" and those of a less egregious character, such as mailing Christmas packages during the holiday season. Plainly, there must be some distinction between the two.

I submit that one clear distinction involves the purpose for which the public employee's efforts are used. Where, as was so often the case under Dorsey's command, a public employer uses his employees for his personal pecuniary gain, that employer may be prosecuted for a theft of public services.

In addition, where a public employer orders an employee to forsake his employment duties in order to tend to the employer's personal affairs, that too may in certain cases constitute a theft of public services. But the RICO statute cannot be so broad as to render it a violation anytime a public employee spends a single minute working on a task related to his employer's personal interest. In that case, it may only constitute a valid theft of services where the employer has so usurped the employee's time that they are rendered unable to perform the services for which they were hired. In such cases, the scope of the misappropriation of employee time may be the distinguishing feature. As the majority notes, Dorsey's conduct in this regard was "so far outside the realm of acceptable police behavior" that it obviously warranted criminal prosecution.

I write separately because I believe the State should recognize some limitation, other than prosecutorial discretion, on its ability to prosecute public officers for the use of their employees' time. Without such limitations, any public officer risks a politically motivated prosecution merely for asking his assistant to help him with a personal task, even if it allows the employer to dedicate himself more completely to his official duties. That kind of disincentive to public service, and potential for prosecutorial abuse, would have nothing but negative consequences to the quality of our public officers. Because of the numerous egregious acts committed by Dorsey, I concur with the majority opinion affirming Dorsey's convictions.

DECIDED JUNE 30, 2005.

*Brian Steel, Garland, Samuel & Loeb, Donald F. Samuel,* for appellant.

*Gwendolyn R. Keyes, District Attorney, Barbara B. Conroy, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Bondurant, Mixson & Elmore, John E. Floyd,* for appellee.