**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be physically received in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 14, 2019**

# In the Court of Appeals of Georgia

A19A0346. CARR v. THE STATE.

COOMER, Judge.

Following a jury trial, Jeffrey Carr was convicted on three counts of violating the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO").[1] On appeal, Carr challenges the sufficiency of the evidence to convict him on all counts, and argues the trial court erred in its instruction to the jury. Carr further contends that the trial court erred in the admission of certain opinion and ultimate issue testimony that was not based on a witness' first-hand knowledge. Lastly, Carr argues that his trial counsel was ineffective. Finding no error, we affirm.

---

[1] Carr was tried and convicted on all counts along with his co-defendant father, Joseph Carr. Joseph Carr's conviction is not a subject of this appeal.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence. We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Falay v. State*, 320 Ga. App. 781, 781 (740 SE2d 738) (2013) (citations omitted). So viewed, the evidence established that between 2009 and 2013 Carr took or received more than $3,046,934 from a 93 year old widow. The widow, who is characterized as a very frugal person, has an estate worth an estimated 20 to 25 million dollars. At trial, the widow testified that she never gave Carr permission to take three and a half million dollars from her, denied ever giving gifts of thousands of dollars to anyone, and denied ever purchasing vehicles for anyone.

Following the widow's testimony at trial, the jury heard testimony from the widow's former business manager and attorney-in-fact under a previous financial power of attorney, Charles Olsen. Olsen testified that he and the widow would meet weekly or every other week so that he could assist the widow with financial and legal matters. Olsen served as the widow's attorney-in-fact from 2007 to 2010. Olsen stated that in the time that he served as her attorney-in-fact and business manager, only once

2

did the widow give a gift worth thousands of dollars. Olsen, in his capacity as the widow's business manager, learned that certain property belonging to the widow had been sold without his knowledge or involvement at Carr's behest for a price below real market value. Olsen was ultimately removed as the widow's attorney-in-fact after Carr insinuated himself into the widow's life and Olsen's relationship with the widow diminished. During the four years Olsen served as the widow's business manager and attorney-in-fact, he received approximately $65,000 as compensation for his services.

The widow's conservator testified that he was appointed by the court to represent the widow in 2014. He became the widow's personal attorney in March 2013, and was given financial power of attorney about a month later. At that time, the widow's taxes from 2010 to 2013 had not been paid, her estate was in disarray, and the widow was not aware of the seriousness of her financial condition. The conservator, who specializes in fiduciary law, testified that Carr engaged in egregious transactions while administering the widow's estate. Specifically, the conservator testified that there was "transfer after transfer after transfer after transfer of money" to Carr's name from the widow's accounts, and noted that such transfers were uncommon for someone with a financial power of attorney. The conservator found two transactions to Carr's personal accounts particularly suspicious and problematic:

one transfer for around $1 million and another transfer for around $700,000. Those transfers related to the controversial sale of property that had belonged to the widow, at which the widow was not present for the sale. The conservator noted the irregularity in how over the course of one year, nearly 100 checks were written to Carr in flat amounts with no real accounting as to how and why they were written. The conservator testified that throughout his time of involvement with the widow's estate, she never directed him to give gifts of thousands of dollars to non-family members.

The investigator in charge of the case testified that he first became aware of potential irregularities with the widow's bank account in 2011. The investigator discovered that 47 checks totaling $507,735 were drawn on an account that was funded by the widow. The investigator stated that several of the checks drawn on the widow's account were made payable to Carr for reimbursement of the widow's expenses; however, the investigator noted that Carr effectively double dipped because payments of those same expenses were paid directly out of the widow's account. There were a total of 96 transactions where checks were written payable to Carr wherein the memo line of the checks indicated that the funds were for specific purposes to be paid by Carr on behalf of the widow, yet the investigator could not

4

find the corresponding transactions from Carr's account to show the payments had actually been made.

The investigator further testified that through undue influence, Carr gained the trust of the widow and ultimately became the widow's 's attorney-in-fact under a financial power of attorney. His investigation revealed that Carr used his influence over the widow to isolate her from her friends and anyone who wanted to contact her. In one particular instance, after the widow was hospitalized to treat injuries from a fall, Carr arranged for her to receive rehabilitative treatment fifty to sixty miles away from her Cobb County home at a facility in Gainesville, Georgia, five miles from Carr's residence. The jury heard testimony that although the widow had expressed a desire to go to a rehabilitation facility near her home, Carr had her move to an assisted living facility near his home. Later, under questionable circumstances, the widow was moved to the residence of Carr's mother and father, who also lived in Gainesville, Georgia. A close friend of the widow testified that for the three years leading up to the trial, the widow had "just sort of disappeared" and that despite her best efforts, she was unable to get in contact with the widow. Starting in 2011, there were approximately three or four inquiries by adult protective services related to

allegations of potential abuse of the widow. However, none of the referrals to adult protective services resulted in any official action.

An expert in forensic accounting and fraud examination testified that after conducting a review of the various accounts belonging to the widow, Carr, and his father, the expert discovered that over $3 million left the widow's accounts and was designated for Carr, Carr's father, and other Carr family members. The expert noted that while some of the funds designated for Carr had been spent on "fun" items such as basketball tickets, clothing, jewelry, and other miscellaneous spending, she could not discern any benefit the widow may have received from the spending. The expert further testified that the widow was still paying her own expenses throughout the relevant period.

The expert went on to testify regarding the predicate acts 1 through 25 in the indictment and confirmed them all with some exceptions. An example of an exception was in relation to predicate act 8 where the expert could see that approximately $63,000 in cash was withdrawn from the widow's accounts, but could not definitively state whether Carr or his father had deposited the checks or received the cash. The expert explained that while she could confirm from the documents that certain transactions occurred, she could not confirm who actually received the cash. The

expert also testified that although she is not a handwriting expert, as part of her training and responsibility she looks for things that are "odd and suspicious" and is trained to identify discrepancies in signatures and handwriting. The expert stated that during her investigation, she noticed substantial differences in the signatures on the checks she reviewed.

Carr was indicted on three counts of violating Georgia's RICO Act, and ultimately convicted on all counts and sentenced to 40 years with 10 to serve in confinement. Carr filed a motion for new trial, which the trial court denied following a hearing. This appeal followed.

1. As a threshold matter, Carr contends that the evidence adduced at trial was insufficient for a jury to find him guilty beyond a reasonable doubt of all three counts in the indictment. More specifically, Carr argues that (1) the indictment did not sufficiently allege and the State did not prove any acts involving theft; and (2) there was no evidence of concealment to support the money laundering predicates. We disagree.

In counts 1 through 3 of the indictment, the State charged Carr in considerable detail with conspiring to acquire money and property through a pattern of racketeering activity (OCGA § 16-14-4 (c)) which was carried out by his participation

7

in an unlawful enterprise (OCGA § 16-14-4 (a)-(b)). OCGA § 16-14-4 (2010) provides that:

> (a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.
>
> (b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.
>
> (c) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.
>
> "A person participates in a pattern of racketeering activity when he or she engages in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents."

*Cotman v. State*, 342 Ga. App. 569, 585 (2) (804 SE2d 672) (2017) (footnote and punctuation omitted). "A conviction under RICO is a two-step process: (1) proving that appellant has committed two or more offenses of the sorts included in the RICO

8

statutes, and (2) proving that the two or more offenses have been committed as a part of an enterprise engaging in a pattern of racketeering activity, as defined in the RICO Act." *Martin v. State*, 189 Ga. App. 483, 495 (10) (376 SE2d 888) (1988).

The indictment charged Carr with committing thirty-six predicate acts: twenty-five acts involving theft and eleven acts involving money laundering. As to the acts involving theft, OCGA § 16-8-2 provides that "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." Despite Carr's argument that he did not unlawfully obtain the widow's property because the money he received were gifts and/or reimbursement for his service as the widow's attorney-in-fact, the widow testified that she never authorized Carr to take $3.5 million from her. The victim's court appointed conservator also testified that Carr engaged in egregious transactions whereby multiple checks were written to Carr from the widow's accounts with no clear purpose or benefit to the widow. Moreover, a forensic accounting expert testified that her investigation confirmed several predicate acts of theft committed by Carr.

9

We note that a RICO conviction only requires proof that the defendant has committed two or more offenses of the kind included in the RICO statutes, and the State is under no obligation to prove all of the predicate offenses alleged in the indictment. *See Bethune v. State*, 198 Ga. App. 490, 491 (1) (402 SE2d 276) (1991). Consequently, the jury could have adduced from the ample evidence presented at trial at least two instances involving theft as charged in the indictment where Carr used his position as attorney-in-fact to unlawfully appropriate money from the widow for his own purpose beyond a reasonable doubt.

As to the money laundering predicate acts, OCGA § 7-1-915 (c) (2) provides that a person commits the offense of money laundering when that person

> knowing that the moneys involved in a currency transaction represent the proceeds of some form of unlawful activity, conducts or attempts to conduct such a transaction which in fact involves the proceeds of specified unlawful activity . . . [and] [k]nowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

The evidence established that Carr, who was insolvent prior to meeting the widow, had accumulated over $1.7 million dollars from the widow's account within 14 months. As previously noted, the State presented evidence that Carr, using his status

10

as the widow's 's attorney-in-fact under her financial power of attorney to write checks from the widow's accounts, did convert funds from the widow's account without her permission under the false pretense that the funds were for the widow's expenses or were gifts from the widow, and converted said funds for his personal use to purchase, among other things, five automobiles, professional basketball season tickets, jewelry, and other personal spending.

Viewed in the light most favorable to the verdict, we find that there was ample evidence presented to convict Carr of at least two predicate acts of theft or money laundering. The predicate acts alleged in the indictment met the definition of a "pattern of racketeering activity" as required under OCGA § 16-14-3 (8) (2010) of "at least two [incidents] of racketeering activity . . . that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." The State established a number of instances of racketeering activity that had the same intents and results (acquisition of money and property), the same victim (the widow), and the same accomplices (Carr, his father, and another person). The evidence further established that these instances were not isolated, but a continuing pattern of criminal

activity. *See Overton v. State*, 295 Ga. App. 223, 232 (1) (c) (671 SE2d 507) (2008). Accordingly, we find no error.

2. Carr next argues that the trial court committed plain error in its instruction to the jury on money laundering.[2] Carr contends that because the jury was not provided with an instruction on the essential elements of the indicted charge, Carr's convictions should be vacated. We disagree.

It is well established that "[j]ury charges cannot be viewed in isolation. Rather, in determining whether there was plain error, jury charges must be read and considered as a whole." *McCullough v. State*, 330 Ga. App. 716, 724 (2) (769 SE2d 138) (2015) (citations and punctuation omitted). Plain error is defined as "that which is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or which seriously affects the fairness, integrity or public reputation of a judicial proceeding." *State v. Kelly*, 290 Ga. 29, 32-33 (2) (a) (718 SE2d 232) (2011) (citations and punctuation omitted). Georgia courts have adopted the following four prong test to analyze plain error:

---

[2] "[A]ppellate review for plain error is required whenever an appealing party properly asserts an error in jury instructions." *State v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011). *See also* OCGA § 17-8-58 (b).

First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the [trial] court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id*. at 33 (2) (a) (citations, punctuation, and emphasis omitted). Accordingly, "plain-error analysis . . . requires the appellant to make an affirmative showing that the error probably did affect the outcome below." *Shaw v. State*, 292 Ga. 871, 873 (2) (742 SE2d 707) (2013) (citations and punctuation omitted).

In the instant case, the indictment charged that Carr committed the predicate act of money laundering in violation OCGA § 7-1-915 (c) (2). The State was required to prove that Carr (1) knew the money involved in the currency transaction were the proceeds from unlawful activity; (2) conducted or attempted to conduct a transaction

that involved the proceeds of specified unlawful activity;[3] (3) used the funds or proceeds from the specified unlawful activity; and (4) knew that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity. *See* OCGA § 7-1-915 (c) (2). However, in its instruction to the jury, the trial court erroneously gave the following charge with no objection :

> A person commits currency transaction fraud or money laundering when that person, knowing that the monies involved in the currency transaction represent the proceeds of some form of unlawful activity, conducts or attempts to conduct such a transaction which in fact involves the proceeds of specified unlawful activity *with the intent to promote the carrying on of specified unlawful activity*. (emphasis supplied).

In its order denying Carr's motion for new trial, the trial court found that while the first two prongs of *Kelly* were met—that is, the charge given was erroneous and obviously so—Carr failed to show that the giving of the incorrect money laundering

---

[3] The specific unlawful activity included the purchase of five automobiles, jewelry, car insurance, professional basketball season tickets, home remodeling, various withdrawals and deposits, and other miscellaneous spending.

charge changed the outcome of the trial or that the error seriously affected the fairness, integrity, or public reputation of the proceedings. We agree.

> Where the indictment charges a defendant committed an offense by one method, it is reversible error for the court to instruct the jury that the offense could be committed by other statutory methods with no limiting instruction. The defect is cured, however, where . . . the court provides the jury with the indictment and instructs jurors that the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt.

*Sharpe v. State*, 291 Ga. 148, 151 (4) (728 SE2d 217) (2012) (citation omitted). Reviewing the jury instructions as a whole, the record clearly demonstrates that the trial court read the indictment to the jury and the jury had a copy of the indictment with them in the jury room during deliberations. The trial court properly instructed the jury on the state's burden to prove every essential element of the crimes charged beyond a reasonable doubt, and instructed the jury that it would be authorized to find Carr guilty if it believed beyond a reasonable doubt that he committed the crimes as set forth in the indictment. The trial court further defined the crimes alleged in the indictment, instructed the jury on the essential elements of the crimes alleged in the indictment, and reminded the jury that the burden of proof does not shift to the

15

defendant. Under these circumstances, Carr cannot demonstrate plain error. *See*

*Faulks v. State*, 296 Ga. 38, 39 (2) (764 SE2d 846) (2014) (no reversible error where

court charged jury on other forms of aggravated assault when indictment only charged

aggravated assault with deadly weapon).

Additionally, we are not persuaded by Carr's argument that because the jury

did not specify which predicate acts it found Carr guilty of, there is no way to know

what predicate acts the jury did find, and as such, Carr may have been found guilty

of a crime for which he was not indicted.

> Evidence of two predicate acts will sustain the RICO conviction[;]
> where the evidence authorized the jury to find that defendant committed
> at least two predicate acts, we need not consider the remaining predicate
> acts charged. This is true even where certain predicate offenses were
> improperly charged in the indictment; if two remaining predicate
> offenses were proven beyond a reasonable doubt, the proof was
> sufficient to support a RICO conviction.

*Dorsey v. State*, 279 Ga. 534, 540 (2) (a) (615 SE2d 512) (2005) (citations and

punctuation omitted). Thus, even with the removal of the money laundering predicate

act, Carr's RICO convictions are overwhelmingly supported by the evidence that he

committed predicate acts involving theft. *See Mosley v. State*, 253 Ga. App. 710, 712

(1) 560 SE2d 305 (2002) ("RICO conviction requires proof that a defendant has

16

committed two or more offenses of the kind included in the RICO statute; it does not require the State to prove all of the alleged predicate offenses."). *See also Thompson v. State*, 211 Ga. App. 887, 888-890 (1) (b) (440 SE2d 670) (1994) (unnecessary for appellate court to address possible defects in certain alleged predicate acts where removal of those acts leaves numerous other predicate acts which properly support RICO conviction).

3. Carr next argues that the trial court erred in admitting non-expert opinion testimony regarding the genuineness of handwriting. We disagree with Carr's characterization of the subject testimony and find no error.

"The admission or exclusion of lay opinion evidence is committed to the sound discretion of the trial court, and appellate courts will not interfere with such a ruling absent an abuse of discretion." *Dagne v. Schroeder*, 336 Ga. App. 36, 38 (2) (783 SE2d 426) (2016) (citation omitted). OCGA § 24-7-701 (a) provides that "[i]if the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are (1) [r]ationally based on the perception of the witness; (2) [h]elpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) [n]ot based on scientific, technical, or other specialized knowledge[.]

17

At trial, the State tendered a witness who was qualified without objection as an expert in forensic accounting and fraud examination. The expert testified that as part of her training and responsibility, she looks for "things that are odd and suspicious, including discrepancies in the signatures and handwriting" when reviewing documents. In particular to the materials reviewed in this case, the expert testified that while she is not a handwriting expert and could not confirm whose signature was on the suspicious deposits she reviewed, she could identify differences in the signatures she saw. Contrary to Carr's argument, the expert did not testify as to the genuineness of the handwriting on the documents she reviewed, which would have been outside the purview of her expertise, but rather, her testimony was rationally based on her perception of the materials she reviewed. The expert did not testify as to whether the signatures on the checks belonged to the widow, Carr, or some other person. The expert merely testified that the signatures on the checks she reviewed were substantially different and went on to describe the differences she noticed in her review of the materials.

Because the record reflects that the expert had the opportunity to form a reasoned opinion as to the discrepancies in the signatures she saw on various checks

while reviewing the financial records in this case, the trial court did not abuse its discretion by ruling that such testimony was admissible.

4. Carr contends the trial court committed reversible error by admitting ultimate issue testimony that was not based on the witness's firsthand knowledge. Specifically, Carr argues that the admission over objection of the State's expert's opinion testimony that Carr had converted certain checks for his personal use without benefit to the victim was not based on any firsthand knowledge. We disagree.

Generally, "witnesses are not authorized to express their opinions regarding an ultimate issue in a case, because to do so would invade the factfinding province of the jury." *Walton v. State*, 291 Ga. App. 736 739 (2) (662 SE2d 820) (2008) (footnote omitted). "However, expert opinion testimony on even the ultimate issue is admissible where the conclusion of the expert is one beyond the ken of the average layman." *Id*. at 739-740 (2) (citation omitted). In the instant case, the State's forensic accounting and fraud expert testified that after conducting an analysis of the financial records and investigating various transactions, she found transactions where Carr converted the widow's funds to his personal use, and from those transactions, the expert could not discern any financial benefit to the widow. The expert's testimony did not reach the question as to whether Carr violated the RICO Act as alleged in the

19

indictment. The expert's testimony was an assessment of facts and not a legal conclusion or a conclusion constituting a mixture of law and fact, and provided the jury with an explanation of the expert's findings after conducting an investigation. *See Fortner v. Town of Register*, 289 Ga. App. 543, 546 (1) (657 SE2d 620) (2008) (expert testimony admissible where testimony did not opine as to the ultimate issue for the jury but instead concerned the sequence of events leading up to the event).

5. Lastly, Carr contends that his conviction should be reversed because he received ineffective assistance of counsel at trial. Carr argues that his trial counsel's failure to file a general demurrer and object to the erroneous jury instruction on money laundering was so harmful to his ability to receive a fair trial as to require reversal of his conviction. We disagree.

> To prevail on a claim of ineffective assistance, [Carr] must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. To show that the performance of his lawyer was deficient, [Carr] must prove that [he] performed [his] duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. And to show that he was prejudiced by the performance of his lawyer, [Carr] must prove a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

20

undermine confidence in the outcome. This burden, though not impossible to carry, is a heavy one.

*Arnold v. State*, 292 Ga. 268, 269-270 (2) (737 SE2d 98) (2013) (citations and punctuation omitted). "An insufficient showing on either prong relieves the reviewing court of the need to address the other prong." *Maurer v. State*, 320 Ga. App. 585, 591 (6) (740 SE2d 318) (2013) (citation and punctuation omitted).

a. Carr argues that the indictment failed to adequately allege theft as a predicate act and thus, trial counsel's failure to file a general demurrer was deficient. More specifically, Carr challenges the predicates involving theft on the basis that without a specific reference to a statute for theft, standing alone the acts alleged in the indictment cannot constitute a RICO predicate. We disagree.

"A general demurrer challenges the very validity of the indictment and may be raised anytime prior to judgment; the special demurrer objects merely to its form or seeks more information and must be raised before pleading to the indictment." *Chapman v. State*, 318 Ga. App. 514, 516 (1) (a) (733 SE2d 848) (2012) (footnote and puncutation omitted).

> It is well established that the test for determining whether an indictment is sufficient to withstand a general demurrer is whether it contains the elements of the offense intended to be charged, and sufficiently apprises

21

the defendant of what he must be prepared to meet, and in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. Thus, if the accused can admit all the indictment charges and still be innocent of having committed any offense, the indictment is defective.

*Id*. (footnote and punctuation omitted). "While racketeering activity must have a crime as its objective, OCGA § 16-14-3 (9) (A) [(2012)] includes within the definition of racketeering activity to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment." *Dorsey*, 279 Ga. at 541 (2) (c).

In its order denying Carr's motion for new trial, the trial court noted that the 22-page indictment contained "an extremely detailed scheme" which included "the parties,[Carr], and an overview of the State's allegations and facts of the case as well as the overt acts and predicate acts of [Carr]." The trial court concluded that the indictment, when read as a whole, clearly set forth acts involving theft as contemplated within the definition of racketeering activity by OCGA § 16-14-3 (9) (B) (2012) ("'Racketeering activity' shall also mean any act or threat involving . . . theft[.]") The indictment charged Carr with "acts involving theft" as part of an

22

overarching scheme to unlawfully acquire money and property. The transactions which the State alleges are criminal racketeering charges are specific money transactions involving specific persons, places, amounts, items, and dates such that Carr was sufficiently apprised of the particular charges against him. *See State v. Pittman*, 302 Ga. App. 531, 533 (690 SE2d 661) (2010) ("Due process is satisfied where an indictment puts a defendant on notice of the crimes with which he is charged and against which he must defend." (citation omitted)). Accordingly, Carr has not demonstrated he was prejudiced by his trial counsel's failure to act. *See Coleman v. State*, 318 Ga. App. 478, 482 (2) (735 SE2d 788) (2012) ("a defendant who was not misled to his prejudice by any imperfection in the indictment (or accusation or citation) cannot obtain reversal of his conviction on that ground." (footnote omitted)).

Moreover, notwithstanding Carr's trial counsel's testimony at the motion for new trial hearing that although he remembered reviewing the predicate acts alleged in the indictment along with the discovery, he could not remember whether he considered filing a general demurrer or the reasons why he did not do so; nothing in the record suggests that, had he filed a general demurrer, the trial court would have granted it. *See Bradford v. State*, 327 Ga. App. 621, 627 (2) (760 SE2d 630) (2014)

(where indictment was sufficient to survive a general demurrer, trial counsel's failure to file a general demurrer could not be deemed deficient performance). Therefore the indictment was sufficient to satisfy due process and withstand a general demurrer, and Carr's trial counsel was not constitutionally ineffective for failing to challenge it. *Smith v. State*, 303 Ga. 643, 647-648 (II) (B) (814 SE2d 411) (2018).

b. Carr next argues that trial counsel was ineffective for failing to object to the erroneous jury instruction on money laundering. However, as discussed more fully in Division 2 of this opinion, Carr cannot demonstrate with reasonable probability that but for trial counsel's failure to object, the outcome of the case would have been different. *See Daughtry v. State*, 296 Ga. 849, 859-861 (2) (f)-(h) (770 SE2d 862) (2015). "Where an appellant fails to meet [his] burden in establishing one prong. . . , we need not review the other, as a failure to meet either of the prongs is fatal to an ineffectiveness claim." *Leanos v. State*, 303 Ga. 666, 669 (2) (814 SE2d 332) (2018) (citation omitted).

*Judgment affirmed. Doyle, P. J., and Markle, J., concur.*